No. 39,626

THE BIG CHIEF SALES COMPANY, INC., and THE BIG CHIEF MANU-FACTURING COMPANY, INC., *Appellants*, v. F. WESLEY LOWE, *Appellee*.

(283 P. 2d 480)

Opinion filed May 7, 1955.

*Percy H. Collins, Jr.*, of Belleville, argued the cause, and *N. J. Ward*, of Belleville, and *F. Duane Roberts*, of Hutchinson, were with him on the brief for the appellants.

*Frank C. Baldwin*, of Concordia, argued the cause, and *Fred Emery*, of Belleville, and *Dean L. Gibson*, of Concordia, were with him on the brief for the appellee.

The opinion of the court was delivered by

THIELE, J.: This was an action to recover on a contract for the erection of a building. The trial resulted in a judgment for plaintiffs for a sum less than that alleged to be due and plaintiffs have appealed.

Under date of December 20, 1951, the Big Chief Sales Company, hereafter called Sales Company, commenced an action against the defendant Lowe. We shall not detail intervening motions and pleadings, but finally a second amended petition was filed naming the Sales Company and Big Chief Manufacturing Company, hereafter called Manufacturing Company, as parties plaintiff. After

alleging status of plaintiffs as corporations it was further alleged that Big Chief Erection Company, hereafter called Erection Company, was a partnership of named persons, and erected the building later mentioned; that on April 13, 1951, defendant Lowe entered in an agreement with the Manufacturing Company whereby that company agreed to furnish material for the construction of a building for the sum of $4,834.93, in accordance with a written sales agreement signed by him and that it was also agreed between the Manufacturing Company and Lowe that the building would be erected by the Erection Company for the sum of $1,200.00; that the sum of $950.00 was to be paid by Lowe at the time the order was signed, the balance to be paid on terms as provided by the A. A. A. meaning the Agricultural Adjustment Administration and which was then being administered by the Productive Marketing Association, and a copy of that sales agreement was attached as part of the petition. It was also alleged the material was shipped to Lowe's premises and accepted by him; that an additional door was to cost $40.80; that Lowe at the time the order was given paid the $950.00 and made arrangements with the Productive Marketing Association for the balance of $5,125.73, but Lowe has failed to pay either plaintiff and refused to complete arrangements with the governmental agency to secure the funds. It was also alleged that the Manufacturing Company had assigned the Lowe sales agreement to the Sales Company, and the building had been constructed by the Erection Company and that by consent of the Manufacturing Company and the Erection Company the Sales Company maintained the action to recover the price of the material furnished by the Manufacturing Company and for the erection of the building by the Erection Company. Further allegations are that Lowe accepted the building and used it, and if the building was not strictly in accord with the terms of the sales agreement, Lowe waived the same by his acts and conduct. Plaintiffs prayed judgment for $5,125.73. The sales agreement follows:

"Sales Agreement

No. 2068

THE BIG CHIEF MANUFACTURING CO., INC.

P. O. Box 473                                                    Phone 7194J1

HUTCHINSON, KANSAS

Date: 4/13-1951,

SOLD TO: Wesley Lowe            SHIP TO: Wesley Lowe
         Narka, Kansas          Complete Address:
                                     *Narka, Kansas*
                                     *4 mi. NE along Hway. ½ N*

Size of Bldg.: 50 x 60     Delivery Date:     *soon as possible*
    Ship by: *Truck*
Foundation Type: Concrete     Installation By: *Self*
Building Erection By: *Big Chief Erection Co.*  Steel Only      Complete — X
Special Instructions:
    NOTE: Purlins to be on 18" centers unless otherwise specified.

| | |
|---|---:|
| Total of Building Price Computations—2 windows | 50.00 |
| Selling Price F. O. B.—50 x 60 complete with Inst. | 4617.09 |
| Freight Cost | 75.00 |
| Sales or Use Tax | 92.84 |
| Erection Cost | 1200.00 |
| TOTAL | 6034.93 |

Deposit With Order $950.00     Balance $5084.93     Terms on A. A. A.

I agree to pay freight and handling charges f. o. b. mill to final designated delivery point. I agree to pay the balance on terms specified and accept delivery within forty-eight hours after I have been notified it is ready.

In case I fail to take delivery when notified, my deposit may be retained as liquidating damages for expenses and efforts in the matter, and dealer may dispose of material without any liability to me whatsoever. It is agreed that cash accepted as deposit on this order may be held in trust by dealer until delivery is effected. The prices quoted are for immediate delivery, but if the price should be changed by the manufacturer before delivery and payment, then this order shall be constructed (sic) as if the changed price was originally inserted herein.

It is understood that no conditions or representations altering or detracting from, the terms hereof, shall be valid unless printed or written hereon or evidenced in writing from our Home Office.

PURCHASER:

X WESLEY LOWE

By:  ..........................

Salesman:

..........................

ACCEPTED:

By: M. C. STUCKY".

Defendant Lowe's answer, so far as necessary here, alleged he entered into an agreement with the Manufacturing Company by the terms of which that company agreed to furnish the materials for and erect on a foundation prepared by him an insulated, galvanized iron, steel frame, building 50 feet in width by 60 feet in length suitable for grain storage and such that he would be able to borrow the balance of the agreed price from the governmental agency then making loans to farmers for that purpose; that the agreement was partly oral and partly evidenced by the skeleton memorandum a copy of which was attached to the petition; that at the time of the contract he paid the Manufacturing Company $950.00 and agreed to pay the further sum of $5,084.93 upon the completion of the building from the proceeds of a loan from the governmental agency; that he performed his part of the contract and erected the foundation but the Manufacturing Company did not substantially or in good faith perform its agreement in the materials furnished and the construction of the building erected; used materials not suitable for the purpose; the work was not performed in good and workmanlike manner nor so that a loan could be procured as contemplated by the agreement; that the erection of the building was carelessly and unskillfully done and the building was not weatherproof as was necessary to provide proper grain storage in that water and other moisture leaked through the structure in excessive quantities, the building was not plumb, the doors were bent, the framework supporting the doors was improperly constructed, the windows were of a type not properly usable in the building and were improperly installed, and the building was wholly inadequate, unfit and not suited for the storage of grain or any other purpose; that defendant repeatedly requested plaintiffs to comply with their agreement and make the building suitable and adequate for storage of grain, all of which plaintiffs failed to do and by reason thereof plaintiffs have failed to perform. Defendant further alleged, in the alternative, that in order to make the building serve its intended purpose, necessary work and materials would cost $3,176.75, or that the difference in value of the building as actually erected and its value if erected in accordance with the agreement, was $3,176.75. Defendant prayed that plaintiffs and the Erection Company take nothing or in the alternative, that if recovery be allowed, it be limited to the difference between the contract price and the amount

defendant will be compelled to expend to make it conform to the agreement.

Plaintiffs' reply contained a general denial and many allegations argumentative in character. It was alleged the agreement was complete in itself except as to time of payment and type of building; that there was no agreement the building would be for grain storage, but if there was any such agreement or talk as to storage prior to the agreement it was not made a part thereof and was not binding on plaintiffs; that defendant Lowe made application to the Production and Marketing Administration for a loan of $5,129.69, which was approved and such approval made due and payable the balance due plaintiffs for the materials and erection of the building; that any ambiguities in the agreement as to payment, materials and construction had been made definite and certain by the acts of the parties, in that application for the loan was made and approved, the materials were accepted, the building was erected and the defendant Lowe inspected and approved the building as constructed. Other allegations will not be noticed here.

After the issues were joined plaintiffs filed a motion for pretrial and the determination of legal issues. The motion was presented to the trial court which allowed the parties to submit briefs on the points in question. The record does not disclose that any briefs were filed nor any further request made to the trial court for a ruling.

On April 19, 1954, the cause came on for trial by a jury, which rendered a verdict in favor of plaintiffs in the sum of $2,125.73 and answered special questions submitted as follows:

"SPECIAL QUESTIONS

1. About how long after the building was built did the defendant learn that it had or probably would leak when it rained?
ANSWER: 3 days.

2. Did the defendant ever do or cause to be done anything to prevent the leaks?
ANSWER: Yes.

3. If you answer No. 2 in the affirmative, then state what the defendant did, or caused to be done, to prevent the leaks?
ANSWER: One phone call. Two personal contacts with Company.

4. If you answer No. 2 in the affirmative, then state the time or times when the defendant acted to prevent the leaks?
ANSWER: Three times. Once in last two weeks of September.

5. When the defendant first learned that the building had or probably would leak, was it then necessary to remove and replace the entire covering of

sheet iron and insulation, in order to make the building usable for the storage of grain?

ANSWER: Yes.

6. When the defendant first learned that the building was not properly built, what amount would have repaired the same so that it complied with the contract?

ANSWER: $3000.00.

7. When the defendant first learned that the building was not properly built, what amount would have repaired the same so as to make the construction thereof that of reasonably good workmanship?

ANSWER: $3000.

8. From what source under defendant's contract with plaintiffs was he to procure funds for the payment of the balance of the contract price for the building to be constructed on his premises by the plaintiffs?

ANSWER: P. M. A.

9. When under the contract for the erection of the building on defendant's premises was the defendant to pay the balance of the purchase price?

ANSWER: Terms on P. M. A.

10. Was the defendant prevented from obtaining a loan from the Production Marketing Administration by reason of the failure of the plaintiffs to construct the building so that it was suitable and adequate for grain storage?

ANSWER: Yes.

11. Was it necessary that a floor be constructed in the building before the Production Marketing Administration would approve the loan, application for which was made by the defendant?

ANSWER: Yes.

12. If you answer the foregoing No. 11 in the affirmative, was it the defendant's obligation to build such floor, in order to secure such loan?

ANSWER: Yes.

13. Would the building, as erected, have been approved by the P. M. A. for a loan if it had been properly floored by the defendant?

ANSWER: No."

Plaintiffs filed their motion to have the answers to Questions 2, 3, 4, 5, 6 and 7 set aside as contrary to or not supported by the evidence and their motion for a new trial on all the grounds specified in G. S. 1949, 60-3001, except subparagraph *Sixth* thereof, and the defendant Lowe filed his motion to retax costs. The trial court denied the plaintiffs' motions and sustained defendant's motion. In due time the plaintiffs perfected their appeal to this court where they specify error in seventeen particulars.

In their brief appellants present their contentions under various headings which are in part overlapping. We shall discuss those contentions in the order presented.

Appellants first contend that the contract evidenced by the sales agreement pertained to two separate matters: one the furnishing

of materials by the Manufacturing Company, the other the erection of the building by the Erection Company. The same contention was made during the trial and the court was requested to so instruct the jury. The background for the contention is appellants' claim that they are entitled to recover for materials, regardless of any faults in construction, and if the defendant was damaged by faulty construction, his recovery could not exceed $1,200.00. Appellants' argument is extended, but the gist of their contention that the contract is divisible is that the manufacturing company was to furnish materials at a stated price and that was its only obligation, and that the Erection Company was only to construct the building for $1,200.00 and that was its only obligation; that while the Erection Company was not a party to the agreement and could not be compelled to perform, it was a third party beneficiary who had performed and having performed could have maintained an action against the appellee for the amount due, and if the performance were lacking, any damage on that account would be recoverable only against the Erection Company. We do not need to discuss the authorities cited by appellants pertaining to third party beneficiaries, nor to comment at length on authorities cited as to whether the contract was divisible. In *Sykes v. Perry*, 162 Kan. 365, 176 P. 2d 579, cited by appellants and by appellee, the question as to whether a contract was entire or divisible was before this court which made some review of the authorities, to which reference is made, and held:

"Where by the terms of a written contract between two parties one of them promises to do one thing and in consideration therefor the other party promises to do two or more things at different times the contract is entire." (syl. 1)

In the above case the court quoted approvingly from *Crawford v. Investment Co.*, 91 Kan. 748, 139 Pac. 481, a statement found not only in the body of that opinion, but set forth as paragraph 4 of the syllabus that:

"The general rule is that whether or not a contract is entire or divisible is one of construction to be determined by the court according to the intention of the contracting parties as ascertained from the contract itself and upon a consideration of all the circumstances surrounding the making of it."

Looking to the contract evidenced by the sales agreement, we discern that while it is silent on some matters, it is clear that appellee purchased materials from the Manufacturing Company for a building to be erected by the Erection Company and that while separate

valuations were put on materials, windows, freight, sales tax and erection costs, his agreement was to pay the Manufacturing Company a single total sum for all, and this view is strengthened by reference to "Selling Price F. O. B.—50 x 60 complete with Inst." If "Inst." does not constitute an abbreviation for installation, the contract is certainly ambiguous. We have no difficulty in determining from the contract that appellee agreed to pay one total sum to the Manufacturing Company for the materials to be placed in the building and for the construction of the building. Taking into consideration the surrounding circumstances, it is pleaded that the partners doing business as the Erection Company are named individuals, who appellants' evidence showed were the officers of the Manufacturing Company and of the Sales Company which shared the same offices. We cannot read the contract except as being one for an erected building. We cannot read it as embracing one contract for materials and another for erection.

In our opinion the question of separability or divisibility of the contract is controlled by the rule of *Sykes v. Perry,* supra, and the contract must be held to be entire.

Most of the other contentions made by the appellants turn largely on their basic contention that the contract was divisible.

A somewhat inconclusive argument is made that the agreement provides that the amount due for materials furnished became due within forty-eight hours after the materials were placed on appellee's premises and our attention is directed to the language "I agree to pay the balance on terms specified and accept delivery within forty-eight hours after I have been notified it is ready" and it is contended that acceptance and use of the materials prevents appellee from asking any damages because of unworkmanlike erection. The contention cannot be sustained. A mere reference to the above language shows that balance due is on "terms specified," and the contract shows beyond possibility of dispute that the total for every item listed was $6,034.93, that $950.00 was to be deposited with the order and the balance on "Terms on A. A. A." and at that stage had appellee refused delivery of materials he would have forfeited his deposit as liquidated damages. The fact he did not refuse the materials when delivered did not make the itemized cost thereof immediately due and payable, nor did it preclude appellee from seeking damages arising from defects in erection of the building.

Disposition of other contentions of the appellants requires a summarized statement of a part of the evidence.

Appellee had seen advertising materials of the Manufacturing Company showing buildings of the quonset type for which it furnished materials, containing an invitation to let that company "take care of your storage problems" and listing particular purposes for farms and industry. He communicated with the company and an agent called on him, the matter of procuring a building suitable for storage of grain and its cost was discussed and he ordered a building as shown by the agreement which provided for the down payment and the balance "Terms on A. A. A." It is conceded that the A. A. A. or its successors by whatever name designated, loaned money to farmers for the erection of buildings for grain storage only. After the agreement was signed appellee applied to the Commodity Credit Corporation for and received a commitment for a loan, which he sent the company. This commitment was subject to six conditions among which was that the loan it would make was on the grain storage facility described; that the facility be inspected by the corporation and that the proceeds of the loan be used to pay any debts on the facility and other provisions indicating clearly the building was to be used for grain storage. We need not detail the evidence as to the building and its erection. The appellants' witnesses conceded the building was not properly erected and at no place in their brief do they contend otherwise. Appellee's evidence showed that a light shower shortly after the building had been erected on July 16, 1951, disclosed leaks in the building and the company was notified and that in September a heavy rain occurred and the building leaked all over. The company made an inspection and offered to coat the building with some tar product if appellee would then pay the balance due, an offer which was not accepted. The evidence tended to show that while the steel frame work was substantially properly erected, the sheet metal covering was very defectively applied with the result that the building leaked at numerous places wetting and damaging, if not destroying, the insulation; that doors were warped and improperly installed, and that the windows, while perhaps all right as windows, were not of the type nor properly installed to prevent leaks, and that to repair the building to make it suitable for grain storage, it was necessary that the sheet metal covering, part of which was made useless by reason of the manner in which it

was installed, be removed from the building, that such sheet metal be properly installed and that split and worthless purlins be replaced, the defects in insulation be remedied and the doors and windows be replaced, in order that the building be made suitable for grain storage. While appellants make some point of the fact the appellee had never installed a floor and possibly some bins as required in order to get approval for a loan, the testimony of Swiercinsky, in charge of the government "P. M. A." office, was that he made an inspection of the building and would not approve it even though the floor and bins were in place.

Appellants also complain that the trial court erred in not giving their requested instruction that defendant might be allowed a reasonable sum for remedying such defects as resulted from lack of ordinary care in the construction of the building and in instructing the jury in substance that if it find the building was to be constructed for the storage of grain, that even if there was no express guaranty or warranty by the contractor, there was an implied warranty the building, when erected, would be fit and adequate for the purpose of storage and until it was so the contractor was entitled to recover only for the contract price, less any damages the owner might have suffered, and in a later instruction, that if the building which was constructed so far departed from the purpose contemplated by the agreement that it was not adequate for the purposes contemplated, then the owner was entitled as damages to the difference between the value of the building as it would have been if constructed in compliance with the contract and what it was actually worth as constructed. Appellants direct our attention to authorities such as *Thomas v. Warrenburg,* 92 Kan. 576, 141 Pac. 255, that where there is a mere defect in a building which can be remedied by repair the measure of damages is the cost of the repair rather than the difference between the value of the building as constructed and that contracted for, and they argue that their proof tended to show the building could be repaired by covering it with an asphalt coating at a cost of about $750.00. When it is borne in mind that appellants' own witnesses testified that the building was improperly constructed, and when all testimony disclosed without dispute that the outside metal sheeting was so placed that it did not properly overlap; that it was nailed in such manner that the nail heads were broken off or in instances that the nails were driven through the sheeting; that the purlins were split; that the doors were improperly

installed; that windows of an improper type were used, it was a fair question for the jury whether the defects could be remedied by covering the building with some tar preparation and thus produce a building of the type and for the purpose intended. An isolated argument the jury disregarded evidence the building could be repaired by spraying is not borne out by the record. The jury apparently did not believe the spraying would produce the building contracted for.

Appellants also argue that the appellee should have, but did not have, the building immediately repaired, thus mitigating his damages, and they direct attention to *Atkinson v. Kirkpatrick*, 90 Kan. 515, 135 Pac. 579, and cases cited therein, and textbook authority that it is a rule of damages that notwithstanding the fault of the other party, the one who is injured will not be permitted to recover damages which might have been averted by reasonable diligence. The building was completed July 16, 1951; the defects clearly appeared in September, 1951, the appellants were promptly notified, made inconclusive statements as to rectifying bad construction, and without doing so brought their action in December, 1951. We need not review the evidence further. The answers to the special questions were that appellee learned of the leaks within three days after the building was erected and notified appellants; that it was then necessary to remove and replace the sheet iron covering and insulation and replace the same in order to make the building usable, and it then would have cost $3,000.00 to repair the building so that it complied with the contract or so as to make the construction thereof of reasonably good workmanship. The $3,000.00 deducted from the amount sued for left a balance of $2,125.73 for which the jury rendered a verdict for appellants. It is true there was contradiction in the evidence concerning what it would have cost to repair the building but the jury resolved that. It is just as true that until appellants refused to comply with their agreement, appellee had no obligation to take over and erect or repair the building. Appellants' refusal, so far as the evidence discloses, was evidenced by them commencing the instant action. After that date, it may hardly be said the appellee was under any obligation to make repairs by substantially rebuilding the building. In any event the jury's findings show appellee was not allowed any sum for any damage occurring after the building was found to be defective.

We shall devote little space to appellants' contention the sales agreement did not show the purpose of the building. The gist of its contention is that the agreement was full and complete and that parol evidence was not admissible to show that the building was being erected for the storage of grain. The agreement shows on its face it was prepared by the Manufacturing Company; that the size of the building was 50 x 60 and complete with installation was to cost $6,034.93, the deposit with the order was to be $950.00 and the balance was to be $5,084.93 "Terms on A. A. A." The agreement didn't specify that 50 x 60 meant feet, and it didn't specify anything about plans and specifications, but it did refer to the fact the building was to be paid for on A. A. A. terms. That was either ambiguous and subject to explanation or it was a reference to financing by the A. A. A. which made no loans except on grain storage facilities. Much could be written on the rule relied on by appellants and exceptions thereto but it would serve no purpose here. We hold that the agreement, prepared by the Manufacturing Company, was not all inclusive and that testimony as to the advertising of the company as to the purpose to be served by its buildings, the solicitation of appellee by the company as to the use of the building, the terms of the order and that it was to be paid for by proceeds of a loan from A. A. A. which loaned only on grain storage facilities, was neither improperly received nor considered.

Appellants make a further contention that other evidence was improperly received, the contention being prefaced by renewal of their contention that evidence the building was to be used for grain storage purposes was improper. The precise complaint is that witnesses were not sufficiently qualified to testify as to the value of the building at the time of its construction, as such testimony required technical knowledge as to costs of material and of repairing defects. Kruckenberg qualified as an erector of like type of buildings and that he had examined the involved building in February, 1954; that the nails in the metal surface were improperly placed and driven; that the corrugated sheet metal had not been properly matched; that the west end was not plumb and the doors were warped; there was a hole in the west end that he could see out of and that the windows were not the proper kind and should be replaced; that had the building been properly erected it would have been worth $6,075.73; that it was no good for grain storage; that to make the building fit, the outside material would have to be

taken off and put on new; that to take off the old material and put it back with new insulation and new purlins, plumbing up the building, fixing doors and windows so as to make the building adequate for grain storage would cost $3,295.20. The appellants' complaint is that the witness did not see the building until three years after its completion. While that may have gone to the weight to be given his testimony, it did not show him as unqualified. His testimony as to the condition of the building was as to its condition when completed in 1951. No specific objection is made to the testimony of Wasinger who qualified as a grain storage and elevator constructer and who testified it would cost over $3,000.00 to repair the building. The other portion of the objection goes to the testimony of a number of farmers who testified. One was also chairman of a committee of a government agency to value farms and improvements and who testified that as erected the building was worth $2,000.00, and taking that amount from the contract price it would take $3,200.00 to repair it so it would be suitable for grain storage. Other farmers who had observed the building of storage facilities and had seen the particular building also testified. The general tenor of their testimony was the building was worth nothing for grain storage; that as the building was constructed it was worth from $1,800.00 to $2,200.00. We cannot say from the record as abstracted that the witnesses were not qualified to give the information elicited from them.

Appellants' complaint that evidence offered by them was wrongfully excluded pertains to an effort to show by a witness that he had a building erected by the appellants in which leaks had been repaired by application of the tar spray which appellants desired to use on appellee's building. It may be doubted that this testimony was either competent or relevant, but if it was it was only cumulative and its exclusion, if erroneous, did not prejudice the appellants.

Appellants also present an argument that the trial court erred in compelling them to elect between recovery on the contract and recovery as on *quantum meruit*. The argument is so intertwined with a contention the contract was divisible that it is difficult to determine the complaint if the contract is not divisible as we hold is the case. Generally we understand the argument to be that when they elected to stand on contract, in effect their evidence as to the value of the building as actually constructed was withdrawn, and they say the result was confusing even to a lawyer and certainly to

the jury. We cannot agree. To have left both theories of recovery in the case would have left confusion, with the possibility that it could be argued as to any verdict rendered, that some of the jurors were persuaded under one theory and some under the other. In view of the record presented, we are of the opinion the trial court did not err in compelling an election.

Appellants' final specific contention that plaintiffs should have recovered interest and their costs embraces two distinct matters.

Appellants first contend that appellee sent them the commitment for the loan from the governmental agency and directed the building to be constructed and the material was thereupon delivered and that fixed the date when the debt became due, and interest should be allowed from that date or the date when the building was completed on July 16, 1951. That might be true if the contract were divisible. We have held it was not. It may be observed first that under the contract the balance was due "Terms on A. A. A.", and under those terms the building had to be one suitable for and adapted to the storage of grain, a condition never met. Second, under the evidence, default in the construction being admitted, it may hardly be said the amount due was known prior to the trial of the action. There was no error as to the trial court's ruling with reference to allowing interest.

Appellants next contend that the trial court erred in taxing costs subsequent to November 3, 1953, against them. Briefly stated, and as shown by a journal entry entered *nunc pro tunc,* counsel for appellants were engaged in the trial of another action. During a recess in that trial counsel for appellants and counsel for appellee met the trial judge in the doorway of the courtroom and asked permission to take up a matter and all present stepped into the reporter's office adjacent to the courtroom when and where counsel for appellee offered to confess judgment for $2,500.00 pursuant to G. S. 1949, 60-2941. Appellants' counsel did not accept or reject the offer but stated they desired to take the matter up with counsel for appellants at Hutchinson, and report later, and that thereafter they did not at any time accept the offer made by appellee. Appellants now contend this was not an offer to confess judgment in open court as required by the above statute, stating it is not necessary to cite any authority that when the court is in recess it is not in session. We find no occasion to discuss application of G. S. 1949, 60-2936 making general provisions as to offers to allow judgments

and the statute (G. S. 1949, 60-2941) which the court followed. It may be conceded that the court was in recess insofar as the other action was concerned, but when counsel for both sides in the instant action stood in the doorway of the courtroom and asked the trial judge to take up another matter, and he did so, it may not be said the court was not in session as to that matter and that what transpired was a nullity. In this case appellants recovered less than the amount of the offer and the trial court properly taxed the costs incurred after the offer.

In their statement of questions involved appellants state one to be whether the trial court improperly submitted to the jury the function of determining the terms of the contract, instead of instructing the jury as to the terms and meaning of the contract. They present no specific argument on the question. We have examined the instructions, which must all be considered together, and find the trial court instructed the jury it was agreed the contract of April 13, 1951, heretofore quoted, was made, that if plaintiffs proved their claims, they could recover the balance due less damage, if any, defendant had sustained by reason of defective materials and construction, and if defendant proved his allegations, the verdict should be for the plaintiff in the amount of the unpaid balance less damages sustained by defendants from defective materials and construction. A further instruction concerning fitness of the building for grain storage need not be reviewed. When the entire record including the pleadings and evidence is read, and the instructions as a whole are considered, it may not be said the trial court improperly instructed the jury.

A painstaking examination of the abstracts and briefs discloses there was no prejudicial error in the trial of the action and that the judgment of the trial court should be affirmed and

It is so ordered.