No. 44,783

Frank J. Casey and Freda J. Casey, *Appellants*, v. Phillips Pipe-
line Company and Sheehan Pipeline Company, *Appellees*.

(431 P. 2d 518)

Opinion filed September 6, 1967.

*Bernis G. Terry*, of Olathe, argued the cause and was on the brief for appellants.

*John J. Adler*, of Kansas City, argued the cause, and *Harley V. Haskin*, of Olathe, was with him on the brief for appellees.

The opinion of the court was delivered by

FATZER, J.: This was an action for damages commenced by the plaintiff-appellants, Frank J. Casey, and Freda J. Casey, his wife, against the Phillips Pipeline Company and the Sheehan Pipeline Company, for the destruction of a crop of zoysia grass, the loss of marine life in the plaintiffs' pond or small lake, the filling of the lake, and loss of alfalfa and bluegrass in Phillips Pipeline right of way. The plaintiffs have appealed from orders of the district court sustaining separate motions to dismiss their cause of action.

The plaintiffs are the owners of a 25-acre farm on Pflumm Road, Lenexa, Kansas. The farm had two ponds, one being slightly larger than the other and referred to by the plaintiffs as the "lake." This larger pond (hereafter referred to as the lake) was approximately sixteen feet deep at its deepest point (at the northeast end where the dam and spillway were located) and was about a half acre in surface. The lake extended to the west and southwest and about twenty feet of the southwest end of the lake extended into a right

of way easement owned by the defendant, Phillips Pipeline Company. The right of way contained several pipelines owned by Phillips, and crossed plaintiffs' property in almost a true north-south direction. Three of the lines were exposed in the water which was two or three feet deep beneath them and extended back west about twenty feet.

The lake was spring fed and was the source of water for the plaintiffs' bathrooms.

On August 28, 1963, Casey left his home in Johnson County at 2:00 a. m. with a truck and trailer and drove to Link's Nursery at St. Louis, Missouri, to purchase Meyer zoysia stolons. He arrived at the nursery at 6:00 a. m. The nursery had started cutting the zoysia sod at 5:00 a. m. and the sod was ground into stolons and loaded in the truck and trailer. Casey drove home, arriving late in the afternoon. He had a crew of men waiting to plant the stolons on a four-acre tract south of his house. The actual planting took about two hours. The stolons were put in a manure spreader and spread on the ground, and were pressed into the soil with a culti-packer which was pulled crossways and longways over the field.

Casey had carefully prepared the four-acre tract for planting the zoysia stolons; it was in excellent condition. The soil had been plowed, and was disced and harrowed weekly for two months before the stolons were planted; it was level and all of the air pockets had been worked out and everything had been kept off the area.

Casey chose August 28, to plant the stolons, and commenced watering them with a sprinkler system from the lake. He had the water system all set up and used a gasoline engine and pump to get the water from the lake. A plastic pipe was used for the intake, which he placed on a ten-foot board to hold the pipe in the water so it would not suck air. It was placed on the board so that it "pulled water off the top of the lake." Casey's wife and son kept gasoline in the engine and the pump ran around the clock.

As customary for zoysia grass, it immediately started to turn brown, then after about five days the grass started to green up "all over the area."

During the latter part of August, Phillips "hired" the Sheehan Pipeline Construction Company to construct another pipeline and do repair work on one of the high pressure gasoline lines in the right of way crossing the plaintiffs' property. Sheehan began work on the plaintiffs' premises on August 28, by making a roadway across the southwest portion of the lake where the pipelines were

exposed. It filled in the two to three feet of water with dirt and then put another two feet of dirt on top of the half exposed pipes for a roadway across the lake. The roadway was twelve feet wide with strength enough to allow tractors, trucks and bulldozers to cross over it. There was evidence that when Sheehan finished the construction and repair work, the dirt used to make the roadway was left there and it washed into the lake causing the depth of water about fifteen feet from the dam to be probably ten inches to a foot deep. Prior to that time, the water was about sixteen feet deep at the spillway.

By September 4, the grass was greened up all over the field and Casey was confident he was going to have a crop. At noon on that date he left for Oklahoma to play golf. He instructed his wife to continue to water the grass until he returned.

At about 3:30 p. m. on September 4, a high pressure gasoline line in the right of way was punctured by Sheehan, allowing the gasoline to escape, which formed a white cloud above the lake area. Mrs. Casey was home at that time and could see the white cloud over the lake area and attempted to go down to the lake but was motioned back by one of the pipeline workers who was standing in the pasture. Another of Sheehan's workmen came up to the house and asked that she turn off any burners which she might have on. Mrs. Casey turned off her stove and hot-water tank. He told her to turn them off because they had a gas line break and the gasoline was very potent. At about 9:00 o'clock that evening, the workman came back and told her that everything had been taken care of and he relit the hot-water tank for her.

When Casey returned home from his golf trip some five or six days later, he could not get a good look at the grass because it was raining, but when he was able to look it over, he noticed the grass had started to turn brown again. He continued to water it, but the grass never regained its green color and no crop of zoysia grass was ever taken off the field. A photograph in the record showed dead marine life and oil and gasoline streaks along the edge of the lake.

The plaintiffs commenced this action and alleged Phillips "hired" Sheehan "to do certain repair and replacement work to a pipeline over the property of the plaintiffs" on an easement owned by Phillips and filed of record in Johnson County. This allegation was admitted by both defendants. The petition then alleged that both

defendants, in carrying out the repair and replacement of the pipeline, negligently caused gasoline to escape from the pipeline into plaintiffs' lake, which destroyed all the marine life and contaminated the water the plaintiffs used to irrigate the zoysia grass which was completely destroyed from the use of the gasoline-tainted water. The petition alleged that in moving the dirt in repairing the pipeline, both defendants caused dirt to erode into plaintiffs' lake, filling the same and rendering it useless as a lake and for the purposes for which it was being used by the plaintiffs. It was further alleged that under Phillips' easement, the defendants were contractually obligated to pay for damages caused to plaintiffs' property in replacing and repairing the pipeline; that in performing the work, both defendants damaged the plaintiffs' property in the amount of $500. It was further alleged that for negligently allowing gasoline to escape into the lake which killed the marine life; causing the destruction of the zoysia grass by use of the gasoline-tainted water; and allowing the lake to fill with dirt, the plaintiffs were damaged in the amount of $20,000. Judgment in the amount of $20,500 was prayed for against each defendant.

The case was tried to a jury on March 28, 1966. Upon completion of the plaintiffs' evidence, both defendants made separate motions to dismiss the action upon the grounds the plaintiffs failed to show any negligence on the part of either defendant and there was no evidence that gasoline had in fact killed the zoysia grass. Further, that there was no evidence the zoysia grass had been destroyed as contended by the plaintiffs.

The district court sustained the defendants' motions to dismiss the action except it entered judgment against Sheehan for nominal damages of $25 for loss of marine life, and $50 against Phillips for the loss of alfalfa and bluegrass destroyed in the right of way.

In argument on the motion for a new trial, the plaintiffs urged that the district court erred in dismissing the plaintiffs' cause of action because there was sufficient evidence requiring the submission of the case to the jury, and in precluding the testimony of two expert witnesses with respect to the value of the destroyed zoysia grass.

At the trial, the plaintiffs called two expert witnesses, William Latta and Chester Mendenhall, to testify to the value of the eight-day-old zoysia grass. The district court sustained the defendants' objections to both witnesses, conceding that although they were experts in the field at the time of trial, they were not qualified to

testify as to the value of the zoysia grass because Latta's opinion was based "on hearsay" since he referred to trade journals not admitted in evidence to prove the value of the grass on September 4, 1963, and because Mendenhall was not an expert on zoysia grass "in this stage of growth and the condition the evidence has shown this was in," and that neither witness had seen the grass in question.

We are of the opinion the district court erred in refusing to permit Latta and Mendenhall to testify as to the value of the crop of zoysia grass. We shall summarize the testimony of each witness and discuss the legal principles applicable.

Latta's testimony was impressive and established his qualifications. He testified he was manager of the Princeton Turf Farms at Riverside, Missouri, and came to the farm in 1964; that Princeton Turf Farms are the second largest growers of commercial turfs in America, with 515 acres under Latta's management including seven acres of zoysia grass; that he attended short courses at Rutgers University; Columbia; Manhattan, Kansas; Lincoln, Nebraska; and Ames, Iowa, and had received considerable schooling from his company. The defendants make no contention Latta was not an expert with respect to zoysia grass and its price at the time of the trial.

Latta testified that Meyer zoysia grass was vegetative—regrowth only; that it is a hybrid plant and will not grow from seed; that a fine seed bed is prepared to a depth of three to six inches before planting; that zoysia is lifted in pads from the field and run through a chopper to cut it into small pieces, separating the pads into stolons; that stolons are put in a manure spreader and spread over the ground and pressed into the soil by a disc packer so they are partially covered by dirt and then irrigation is started; that watering is continued ordinarily for approximately ten days and the grass is generally established within that period; that if it becomes established and starts to green up, irrigation is stopped and after that nature takes its course.

Latta testified that zoysia grass may be planted any time after May 15, through the period of October 15; that with reference to the plaintiffs' zoysia grass planted on August 28, he stated it would have been more desirable had it been planted earlier, but he felt that the planting was adequate; that he was experienced in growing zoysia grass from both plugs and stolons, and had prepared zoysia grass for market in the stolon form much the same as were the stolons prepared which the plaintiff purchased; that after the

stolons are planted, the plant goes into a state of shock and has a tendency to "brown off" for three or four days; that if the soil is kept moist and after the shock period, the grass greens back up and the grower then knows "he has established the seedling or stolon at that time."

Latta further testified that in managing the turf farm he had occasion to sell zoysia grass at various stages of its development; that he had sold it in his own area and was acquainted with the value of zoysia grass; that it was a part of his business to establish the price of the grass for his company; that he was not with Princeton Turf Farms in 1963, but had available the price of zoysia in September, 1963, from various catalogues, but did not have them with him; that he handles the pricing for his company in the Kansas City area, and that with respect to the zoysia grass in question it was his opinion, if the grass had begun to green up, he would consider it to be established and once established, he would consider it to have its mature value. When asked if he knew the present wholesale price of zoysia grass, the court sustained the defendants' objection, ruling that the wholesale price must be the price on the date involved. Latta was unable to give the wholesale price of zoysia grass on September 4, 1963, but stated he could do so by checking company research data and trade journals.

Latta was recalled the following day and out of the presence and hearing of the jury, he testified that he was not in the zoysia business on September 4, 1963, and to arrive at the value of the zoysia grass it was necessary for him to read various market research data of his company. He described market research data, referred to by the district court as trade journals, as information compiled from existing circumstances regarding prices, whether a product is saleable and what possible volumes might be involved; that current prices and market values for September 4, 1963, were included in the research data; that the market research data is compiled by him and by all individuals engaged in growing, processing, and selling the grass, and that this was standard operating procedure in his business and used by him at all times in the management of the farm and the sale of zoysia grass. In response to a hypothetical question, taking into account all of the factors of plaintiffs' zoysia crop, Latta stated he had an opinion as to the value of the zoysia crop on September 4, 1963. The district court sustained the defendants' objection upon the grounds heretofore stated.

As indicated, the district court rejected Mendenhall's testimony

as to the value of the plaintiffs' zoysia grass on September 4, 1963, ruling he was not qualified as an expert at the stage of growth and condition in which the evidence disclosed the plaintiffs' grass to be on that date. The evidence showed Mendenhall to have august credentials to testify. He was a resident of Overland Park and had been a golf superintendent at Wichita and at Kansas City where he was the superintendent or greens keeper at the Mission Hills Country Club for 31 years. He brought the first zoysia into the Kansas City area in 1949 when he was doing extension work for the Green Section of the United States Golf Association. He was a member of the Green Section for a number of years and during the last 30 years at Mission Hills, he had devoted his entire life to turf grasses. He testified he had gone to seminars in connection with the raising of zoysia and other grasses; that he was experienced with zoysia grass and used some at Mission Hills and had helped with other golf courses. He testified that in 1963, he was actively engaged in the business of raising turf, including zoysia grass at a small nursery; that he sold it in 1963 to people who came to his home to buy it on a commercial basis for their lawns, selling 50 square yards to one person and probably 5,000 to 6,000 plugs to individuals, and he considered his price a fair price for the commercial sale of zoysia. He further testified that he had planted zoysia grass by stolons on a small scale but had never actually been in contact with the planting of large areas; that when zoysia is planted by stolons, its appearance for the first three or four days is rather brownish; that in good growing weather it may retain the brownish color for about a week; that thereafter green shoots begin to show and the color changes with the green shoots coming out, and that the sign of life in the stolons is the green shoots coming out of the nodes. He testified he had not been to the plaintiffs' farm and had not seen any zoysia grass there.

After testifying as to the preparation of the ground for planting and describing what was a good agriculture practice in preparing a bed in which to plant zoysia stolons, Mendenall was asked a hypothetical question taking into account all the conditions and factors disclosed by the evidence with respect to the planting and growth of the plaintiffs' zoysia stolons, whether he had an opinion of the commercial value of the plaintiffs' grass on September 4, 1963, and upon the defendants' objection, the court ruled he was

not qualified to give his opinion as to the value of the grass on that date.

K. S. A. 60-456 relates to expert and other opinion testimony, and subsection (*b*) reads:

"If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness."

The statute requires that the expert witness base his testimony upon facts personally perceived by or known to him or made known to him at the hearing. "Perceived" means knowledge acquired through one's own senses (K. S. A. 60-459 [*c*]), and "made known" refers to facts put in evidence. The rule must be considered in connection with K. S. A. 60-458 by which it is unnecessary for the witness to specify the data before expressing his opinion.

It may be stated the parties, as well as the district court, at the time of trial on March 28, 1966, considered that the testimony of both Latta and Mendenhall clearly showed they possessed special and peculiar knowledge and experience to establish their expertise in the field of growing, processing and the sale of zoysia grass, to qualify them as expert witnesses. (K. S. A. 60-408; 60-419.) No claim is made otherwise. As indicated, the district court rejected Latta's expert testimony as to the value of the plaintiffs' zoysia crop on September 4, 1963, because it was based "pretty much on hearsay" since he had referred to market research data and trade journals not admitted in evidence, and because he was not familiar with the grass business in 1963, and Mendenhall's testimony was rejected because the court considered it was not possible for him to give an opinion as to value of the crop "in [the] stage of growth and the condition the evidence [showed it] was in," and because neither witness had seen the plaintiffs' crop.

We think the district court erred in ruling that Latta could not give an opinion as to value in 1963 by utilizing market research data and trade journals. Publications such as trade journals and market reports are considered to be competent evidence in and of themselves. This court has held that in proving the fact of market value, accredited price-current lists and market reports, including those published in trade journals or newspapers which are accepted as trustworthy by growers and dealers throughout the trade territory, are admissible as an exception to the hearsay rule. (*Evans v. Mose-*

*ley,* 84 Kan. 322, 330, 114 Pac. 374; *Ray v. Railway Co.,* 90 Kan. 244, 248, 133 Pac. 847; *Poultry Co. v. Railroad Co.,* 99 Kan. 540, 543, 163 Pac. 448; *Nelson v. Railroad Co.,* 116 Kan. 35, 38, 225 Pac. 1065; *Webber v. Umback,* 125 Kan. 117, 263 Pac. 786.) See, also, K. S. A. 60-460 (*bb*); VI Wigmore on Evidence, §1704, p. 26.

It has likewise been held that an expert witness may give his opinion even though it is founded not upon personal observation but upon knowledge gained from books and treatises in the field and such use of the publications does not constitute a hearsay use, and a duly qualified witness may be permitted to base his testimony as to the value of a commodity in part, at least, upon commercial circulars, market reports, or trade journal quotations. (*Remsberg v. Cement Co.,* 73 Kan. 66, 84 Pac. 548; *Hoxsie v. Empire Lumber Co.,* 41 Minn. 548, 43 N. W. 476; *Shock v. Mrs. Ragsdale's Foods Co.,* 228 S. W. 2d 353, 354 [Tex. Civ. App. 1950]; *Glantz v. Freedman,* 100 C. A. 611, 280 Pac. 704; *Betts v. Southern Cal. Etc. Exchange,* 144 Cal. 402, 409, 77 Pac. 993; *Urquhart v. Barnes,* 335 S. W. 2d 666, [Tex. Civ. App. 1960]; *Shahmoon v. Indus., Inc. v. Dept. of Health N. J.,* 93 N. J. Super. 272, 225 A. 2d 699; *Miller v. Travelers Insurance Co.,* 111 Ga. App. 245, 247, 141 S. E. 2d 223; *State Roads v. Creswell,* 235 Md. 220, 201 A. 2d 328; *City of Terre Haute v. Terre Haute Wtr. Wks.,* 133 Ind. App. 232, 239, 180 N. E. 2d 110.) See, also, Anno. 43 A. L. R. 1200; McCormick on Evidence, §296, p. 620; II Wigmore on Evidence, §665b, p. 784; III Wigmore on Evidence, §711, p. 41; 29 Am. Jur. 2d, Evidence, §893, pp. 999, 1000. In *Remsberg v. Cement Co.,* supra, it was said:

". . . Many of these facts and opinions testified to were certainly matters of technical knowledge and science, and were proper matters of expert testimony; but the court afterward refused to consider this evidence, on the ground that the evidence was in effect a repetition of what the witness had read in books and was not based upon his personal observation and experience. In this there was error. The witness, in the main at least, did not undertake to repeat what any author or book said on a given subject, but gave his opinion from the weight of authorities as it appeared to him, necessarily calling his own experience to his aid in determining such weight." (l. c. 68.)

Value in the business sense consists largely of the opinions of persons familiar with the market, and those opinions are largely what is said and reported by others. Trade journals are generally recognized sources of information covering values, and the record contains testimony to that effect. When an expert witness testifies as to value, relying in part on market data and trade journals, such

data and journals do not have to be admitted in evidence before his testimony is admissible. (*Hoxsie v. Empire Lumber Co.*, supra; *Shock v. Mrs. Ragsdale's Foods Co.*, supra; *Glantz v. Freedman*, supra; *Betts v. Southern Cal. Etc. Exchange*, supra; *Urquhart v. Barnes*, supra; *Shahmoon Indus., Inc., v. Dept. of Health N. J.*, supra; *City of Terre Haute v. Terre Haute Wtr. Wks.*, supra.) The fact that Latta consulted market research data and quotations in trade journals as a source of knowledge of the value in 1963 did not render his opinion inadmissible under any exclusionary rule, nor was it hearsay. (*Shock v. Mrs. Ragsdale's Foods Co.*, supra; *Malone v. New York Life Ins. Co.*, 148 Kan. 555, 83 P. 2d 639.)

The district court gave as an additional reason for rejecting Latta's testimony, that he was not in the grass business in 1963. This, likewise, was error. An expert witness need not have acquired his special knowledge or experience, which he is to present to a jury, at a time before the date of the occurrence of the event which is in issue before the jury. (*Walton v. Sherwin-Williams Co.*, 191 F. 2d 277, 284.) It was unnecessary for Latta to have acquired his special knowledge or experience in the grass business on or before September, 1963, and he was competent to testify on the subject, although he did not have actual personal knowledge of any particular sales. (*Hoxsie v. Empire Lumber Co.*, supra.) His opinion of value sought to be introduced was based in part upon market data and trade journal quotations of his company as of September 1963, and, as we have seen, he was qualified to give his opinion based in part on those reports.

We now turn to Mendenhall's expert testimony which was rejected by the district court because he was not familiar with the stage of growth and the condition the evidence showed the plaintiffs' grass was in. The record is replete with his qualifications and the district court expressly stated that both he and Latta were experts in the field. He was actively engaged in the business of raising zoysia grass in 1963, and sold it during that summer on a commercial basis and considered his price fair and reasonable. He had planted zoysia grass by stolons and testified to its characteristics in growing therefrom. There is no rule requiring that the expert have a special knowledge of every aspect of his field. The test of competency of an expert witness is whether he discloses sufficient knowledge of his subject to entitle his opinion to go to the jury. (K. S. A. 60-419, 60-456.) Where an expert witness has disclosed

a sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of degree of his knowledge goes more to the weight of the evidence than to admissibility. (*Denver v. Railway Co.*, 96 Kan. 154, 150 Pac. 562; *Malone v. New York Life Ins. Co.*, supra.) In *Temple v. Continental Oil Co.*, 182 Kan. 213, 320 P. 2d 1039, rehearing denied 183 Kan. 471, 328 P. 2d 358, it was contended one of the plaintiff's expert witnesses was not qualified to testify on matters concerning oil field reserves because the witness did not have degrees in the fields of geological engineering or in petroleum geology. It was said:

"We are not disposed to quibble over the nature of the degree Mr. Powers has in geology. He was educated in geology and by experience over many years in working with oil companies is qualified to testify as an expert and state his opinion . . ." (1. c. 222.)

We are of the opinion the district court erred in rejecting Mendenhall's testimony. The weight to be given his opinion as an expert witness testifying as to the value of the plaintiffs' grass is a matter for argument of counsel, and determination by the jury.

The district court stated that one of the reasons it rejected both Latta's and Mendenhall's opinions was that neither witness had seen the plaintiffs' grass. McCormick on Evidence, Sec. 296, p. 620, states the rule that "[a]n expert witness may give his opinion though it is founded not upon personal observation . . ." Under the facts and circumstances prevailing, the fact that neither Latta nor Mendenhall had seen the plaintiffs' crop at the time of its alleged destruction affected the weight rather than the competency of their testimony. (*Big Chief Sales Co., Inc. v. Lowe*, 178 Kan. 33, 45, 283 P. 2d 480; *Sacramento Suburban Fruit Lands Co. v. Klaffenbach*, 40 F. 2d 899; *Bagdasarian v. Gragnon*, 31 C. 2d 744, 192 P. 2d 935; *Brill v. Mushinsky*, 194 F. 2d 158, 159; *United States v. 2,877.37 Acres of L. in Harris County, Tex.*, 52 F. Supp. 696). This court has recognized that a growing crop has a value and that a liberal rule as to proof thereof should be applied. (*Sayers v. Railway Co.*, 82 Kan. 123, 127, 128, 107 Pac. 641.) After both witnesses have testified as to the value of the plaintiffs' crop based upon the factors relating thereto as stated in the hypothetical questions, the means and extent of their information, and therefore the worth of their opinions, may be developed at length on cross-examination. (*Eisenring v. Kansas Turnpike Authority*, 183 Kan. 774, 332 P. 2d 539.)

In our opinion, the plaintiffs' witnesses were eminently qualified

as experts, specialized by experience, education and technical training in the zoysia grass business. Under all the facts and circumstances fully disclosed by the record and pursuant to K. S. A. 60-456, Latta and Mendenhall were qualified to give their opinions concerning the value of the plaintiffs' crop.

The defendants contend there was no evidence that gasoline from the punctured high-pressure line got into the lake, or if it did, that gasoline was pumped with water from the lake onto the plaintiffs' zoysia crop. The contention lacks merit. The evidence was that the portion of the high-pressure gasoline pipeline which was punctured was in close proximity to the plaintiffs' lake; that the line contained premium-base gasoline which was under such pressure as to form a white cloud around and above the lake which the plaintiff's wife could see over the barn; that the defendants' employees were so concerned about the potent gasoline escaping from the high-pressure line that they "waived" the plaintiff's wife away from the area and one of them went to her home and asked her to turn off all burners in the house; that gasoline was discharged for approximately six hours when the employee returned and told the plaintiff's wife they had the problem under control and he relit the hot-water tank; that there was gasoline in the lake and that marine life had died, and that the plastic intake pipe for the plaintiffs' pump took water "off the surface" of the lake which was pumped onto the grass, and, although the grass had greened up "all over" and the plaintiff "was confident he was going to have a crop," after September 4, 1963, the grass turned brown and died. This evidence was circumstantial evidence and strongly tended to show that gasoline-tainted water from the lake was pumped onto the grass causing it to die. It is common knowledge that gasoline has a specific gravity less than water and when the two become mixed, gasoline will "float" on top of water.

Circumstantial evidence in law is evidence that tends to prove a fact in issue by proving other events or circumstances which, according to the common experience of mankind, are usually or always attended by the fact in issue, and therefore affords a basis for a reasonable inference by the jury or court of the occurrence of the fact in issue. (*Wolff v. Employers Fire Ins. Co.*, 282 Ky. 824, 140 S. W. 2d 640, 130 A. L. R. 682.) Our cases to the same effect are *Sternbock v. Consolidated Gas Utilities Corp.*, 151 Kan. 81, 98 P. 2d 162; *Briggs v. Burk*, 174 Kan. 440, 257 P. 2d 164; *Security Milling Co. v. Ketchum*, 185 Kan. 694, 347 P. 2d 433; *Hutchens v.*

*McClure,* 176 Kan. 43, 269 P. 2d 473. It is within the province of the jury to weigh all conflicting evidence and to draw all reasonable conclusions from the evidence introduced.

A cause of action may be proved by circumstantial evidence (*Balthazor v. B & B Boiler & Supply Co.,* 169 Kan. 188, 217 P. 2d 906; *Asche v. Matthews,* 136 Kan. 740, 18 P. 2d 177), and such evidence, in order to be sufficient to sustain a verdict of a jury, need not rise to that degree of certainty which will exclude any and every other reasonable conclusion. (*Security Mill Co. v. Ketchum,* supra; *Sternbock v. Consolidated Gas Utilities Corp.,* supra; *Lane v. Insurance Co.,* 113 Kan. 365, 214 Pac. 92.) Likewise, proximate causation in a proper case may be shown by circumstantial evidence. (*Klassen v. Creamery Co.,* 160 Kan. 697, 165 P. 2d 601; *Rusch v. Phillips Petroleum Co.,* 163 Kan. 11, 180 P. 2d 270.) In *Railroad Co. v. Perry,* 65 Kan. 792, 70 Pac. 876, it was held:

"The fact that soon after the passing of an engine a fire starts near a railway-track in an enclosed field covered at the time with a growth of highly inflammable vegetation, and travels before a high wind in a direction away from the track, is sufficient to warrant a jury in finding that the fire was caused by the operation of the railroad, without its appearing that the engine emitted sparks or live cinders or was put to special exertion, and without further proof excluding other possible origins." (Syl. ¶1.)

See, also, *Thomas v. Kansas City Southern Rly. Co.,* 197 Kan. 747, 421 P. 2d 51. If the circumstances present a reasonably adequate cause, they will be sufficient to go to the jury, even though some other cause which may be suggested may not be excluded.

In the instant case the evidence was undisputed that the pipeline was negligently punctured by Sheehan's employees, causing potent gasoline to escape under high pressure which formed a cloud above and around the lake causing the gasoline to get in the lake and water from the surface was pumped onto the grass. Such evidence affords a basis for a reasonable inference by a jury that gasoline was pumped onto the grass, causing it to die. As was said in *Railway Co. v. Wood,* 66 Kan. 613, 72 Pac. 215:

"It is true . . . that presumptions may not be based upon presumptions, and that it will not do to consider chance or circumstantial evidence having but a questionable or circumstantial basis of fact, but this is very far from announcing that an undisputed fact may not be used as a basis from which to draw a reasonable conclusion . . ." (l. c. 617.)

The defendants contend the proof is short of showing that gasoline-tainted water will kill zoysia grass. The contention abounds

on the ridiculous. This court takes cognizance of the fact that gasoline is a highly volatile liquid hydrocarbon mixture containing antioxidants harmful to the natural growth of vegetation. Judicial notice takes the place of proof and is of equal force. (*Insurance Office v. Woolenmill Co.*, 72 Kan. 41, 82, Pac. 513; *Brandon v. Lozier-Broderick & Gordon*, 160 Kan. 506, 163 P. 2d 384.) K. S. A. 60-409 (*b*) (3) provides that judicial notice may be taken without request by a party, of facts as are so generally known or of such common notoriety within the territorial jurisdiction of the court that they cannot reasonably be the subject of dispute. This court takes cognizance without proof of fact of the general qualities of gasoline, and that when applied to a lawn, turf, or zoysia, the grass will die.

The defendants argue the district court did not err in sustaining Phillips' motion to dismiss with respect to the destruction of the zoysia crop and the filling in of the lake with dirt. Phillips argues that the relationship existing between Sheehan and it was that of an independent contractor, and in any event the work was not inherently dangerous, and cites and relies upon *Laffery v. Gypsum Co.*, 83 Kan. 349, 111 Pac. 498, 45 L. R. A. [ns] 930, Ann. Cas. 1912A 590, and *Phillips Pipeline Co. v. Kansas Cold Storage, Inc.*, 192 Kan. 480, 389 P. 2d 766. We do not agree. As indicated, the plaintiffs pleaded and the defendants both admitted that "Sheehan Pipeline Company *was hired* by the Phillips Pipeline Company to do certain repair and replacement work." (Emphasis supplied.)

On their face, the admissions of the defendants are to the effect that Phillips was laying the pipeline and had "hired" Sheehan to do the work. It is not contended the work was not in progress when the break in the pipeline occurred. Considering the entire record, the plaintiffs should be given the benefit of every inference that can be reasonably drawn from the pleadings and evidence viewed in the light most favorable to their claim. (Barron and Holtzoff, Vol. 2B, §919, pp. 146, 147.) In view of the fact that the law requires that, if on the facts the relief sought could be granted, a case should not be involuntarily dismissed. (Barron and Holtzoff, *op. cit. supra*, p. 148; K. S. A. 60-241 [*b*].)

We are of the opinion there was substantial evidence from which the inference could be reasonably drawn that Sheehan was the agent, or at least the servant, of Phillips in the work being done, and the district court erred in sustaining Phillips' motion to dismiss the

plaintiffs' claim for the destruction of the zoysia crop and the filling of the lake with dirt. Likewise, we are of the opinion the district court erred in sustaining Sheehan's motion to dismiss the plaintiffs' claims.

Other points have been raised by the parties, but it is unnecessary to decide them. The district court erred in rendering judgment for nominal damages against each defendant and in overruling the plaintiffs' motion for a new trial. Its decision is reversed with directions to set aside such judgments and to grant the plaintiffs a new trial.

It is so ordered.