NOT DESIGNATED FOR PUBLICATION

No. 125,441

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CURT DANIEL VANDEVELDE,
*Appellant*.

MEMORANDUM OPINION

Appeal from Atchison District Court; MARTIN J. ASHER, judge. Submitted without oral argument. Opinion filed October 4, 2024. Affirmed.

*Kai Tate Mann*, of Kansas Appellate Defender Office, for appellant.

*Sherri L. Becker*, county attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before HILL, P.J., ATCHESON and CLINE, JJ.

PER CURIAM: A jury convicted Curt Daniel Vandevelde of a series of property crimes in 2022. On appeal, he challenges the sufficiency of the evidence to support some of his convictions, the district court's denial of his motion for acquittal and failure to sua sponte instruct the jury on necessity and compulsion defenses, as well as the prosecutor's statements during closing arguments. He also asserts a cumulative error claim. After a careful review of the record and arguments on appeal, we find Vandevelde's arguments are unpersuasive and do not require reversal of his convictions.

1

*Vandevelde's trek through Atchison County*

Vandevelde claims to have experienced a cascade of bad luck while traveling through Northeast Kansas in late June 2020. One Sunday evening, after working a job in Topeka, he and a coworker drove to Holton, Kansas, looking for side work. They moved on to the Golden Eagle Casino (where Vandevelde is a member) to gamble, then Vandevelde proceeded to Leavenworth with the intention of taking his coworker home. On the way, Vandevelde claimed the power steering pump in his car went out a few miles after passing through Atchison, Kansas. It was around 10 p.m., and Vandevelde had no cell phone service. He pulled into a parking area near some silos, then drove about half a mile on a gravel road up a hill trying to get cell service. Unable to locate service, he then turned onto another road, intending to circle back to the highway. He claimed the road became muddy, so he stopped because the area was very dark and his tires were sliding. Vandevelde said it was foggy that night, so neither the stars nor the moon was visible.

While Vandevelde climbed a tree trying to get cell service, his coworker went to knock on the door of a nearby house seeking help. Neither men succeeded in their efforts, so they began walking towards "a big bunch of lights" they believed emanated from a Walmart they passed in Atchison. Vandevelde's knee started hurting after he stepped into some water that was running across the road, so he stopped by a bridge. He did not want to keep walking, and his coworker did not want to wait for help on the bridge. They decided the coworker would keep walking towards Atchison "to figure something out" while Vandevelde would wait at the bridge or go back to the car.

Vandevelde spent about four hours on the bridge. While he was there, he said he found a green Dum Dum sucker—which he ate—and a Golden Eagle Casino card on a lanyard. He contends that he twirled the lanyard around his fingers until it broke then

used the card "to pick mud out of the bottoms of [his] shoe." When the sun came up, he headed back towards his car.

*Vandevelde's property crimes wreak havoc.*

The next day, which was June 29, 2020, nearby residents reported a series of property crimes and unusual encounters with a stranger. Law enforcement eventually located Vandevelde hiding in a wooded area in the vicinity of the incidents. While Vandevelde admitted to the encounters, he maintained he had an innocent explanation and denied committing any crimes.

1. *The Weber property*

After Vandevelde left the bridge and set out towards his car, he eventually came upon Dale Weber's house. Video surveillance from Weber's security cameras show Vandevelde looking through the windows of two trucks that were parked outside and reaching his arm into the truck beds. According to Vandevelde, he was thirsty, exhausted, and looking for something to drink. He said he saw a cooler in one of the truck beds and Sprite boxes beside the cooler. And he claimed he looked inside the vehicles for something to drink or a phone charger since his phone had died on the bridge.

Vandevelde then entered Weber's unlocked shop, hoping to find someone inside or something to drink. He admitted opening what he thought was a refrigerator—again, looking for something to drink—but it turned out to be a freezer. He turned to a shelf with power tool batteries plugged in, looking for a cell phone charger. Vandevelde moved items around and when he located the monitor for the security cameras, he unplugged it. He testified the reason he did this was because he knew he was not supposed to be in the shop.

When Vandevelde left the shop, he said Weber's dog was beside the front door of the house, barking at him. So he went behind the house, where he found a spigot and got a drink. Then he "got back on the road."

That evening, Weber went out to his shop to put away tools and noticed "some things that were off." His camera recording system and a row of batteries had been unplugged, a bag of Dewalt tools had been placed on the shop floor next to the door instead of the shelf where Weber normally stored them, and another bag of tools had been placed behind a mower. He also noticed a footprint he did not recognize.

Weber contacted law enforcement, who came out to investigate. Weber showed them the tools that were out of place and the unplugged security system. They also viewed the video surveillance footage of Vandevelde rummaging in the vehicles, created before he unplugged the security system.

A week later, Weber discovered his Stihl chainsaw was missing. Weber knew the chainsaw was in the shop the morning of June 29 because he saw it there and had contemplated using it that day but opted to use hand tools instead. Six months later Weber's chainsaw was recovered in neighbor Albert Knowles' field, west of Weber's property. The chainsaw was found lying along a tree line, with frozen water inside the case (consistent with the chainsaw being in that location for some time), and it had leaves and debris blown up against it.

2. *The Knowles property*

After leaving Weber's, Vandevelde passed Albert Knowles' house. He did not stop because there were not any lights on. He maintained that he kept walking around, knocking on doors, and asking people to use their phone—to no avail. He returned to Knowles' house at one point, but this time, Knowles was present. According to

Vandevelde, he told Knowles he had walked all morning, his car was broken down, and his phone was dead. He asked Knowles if he "could have some help and get a drink of water." According to Vandevelde, Knowles told Vandevelde that he was leaving so Vandevelde could not use his phone, but he could drink out of his spigot. Vandevelde says he took a drink from the spigot then left to find his car.

Knowles described their encounter differently. He said Vandevelde approached him while he was out working in his shop. Vandevelde told Knowles he had "been walking for 5 miles," and asked for a drink of water. Knowles told him he could get one from the faucet on the side of the house. Knowles said Vandevelde never asked to use a phone or inquired about soliciting help from law enforcement, family, or friends; and he "disappeared just as quickly as he came." Knowles did not see Vandevelde use the water spigot, nor did he hear the water spigot turn on before Vandevelde left.

3. *The White property*

After leaving Knowles' property, Vandevelde began searching for his car again. He says he stopped to rest beside a hay bale, where he fell asleep. When he awoke, he resumed knocking on doors looking for help. Vandevelde says he encountered a child playing basketball at one of the houses, where he took another drink from their spigot. But Vandevelde did not ask the child for help because no one else appeared to be home.

Sometime later he arrived at the home of B.J. and Melissa White. According to Vandevelde, as he was approaching the house, he saw two envelopes lying on the ground near the front door. He assumed they were mail, so he picked them up to give to the residents. The envelopes were not sealed but Vandevelde did not open them. Vandevelde claimed he knocked on the Whites' front door, but no one answered.

At this point, Vandevelde said he was "at [his] wit's end." His knee was swollen and he had blisters on his feet, so he sat on the Whites' porch for a while. But since the sun was beating down, he went into a nearby shed to get out of the sun. He said the door to the shed was open. He leaned against the door jamb of the shed for a while but eventually found a mattress propped against a wall in the shed. He laid down the mattress and sat on it to elevate his knee. He then removed his shoes and socks and fell asleep.

Sometime later, Melissa opened the door to the shed, panicked when she spotted Vandevelde, and woke him up. Aiming to calm Melissa, Vandevelde kept telling her "I'm sorry" and put his hands out with his palms forward because he did not want her to think he planned to harm her. Melissa screamed and ran into her house. B.J. came out with a gun.

According to Vandevelde, B.J. told Vandevelde to "move away," and Vandevelde attempted to express that he meant no harm. They talked "for quite a while," with Vandevelde explaining that he was stranded and his phone was dead. Vandevelde said he asked if he could call his friend Sarah, but B.J. told him to leave.

Like Knowles, B.J. told the jury a different version of events. B.J. said when he came outside with his gun, Vandevelde was exiting the shed. B.J. yelled at him to stop and raise his hands, but Vandevelde continued to walk around behind the shed where B.J. could not see him. B.J. went around another way and asked Vandevelde to get into the driveway where B.J. could see him, because by then he was on the other side of a car. B.J. asked what Vandevelde was doing in their shed. Vandevelde told B.J. he had been hitchhiking, was tired, and needed a place to rest. While Vandevelde was holding a phone, he did not mention it or ask B.J. to call anyone. Vandevelde then left, cutting through a neighbor's field. At that point, B.J. spoke to Melissa and found out she had called law enforcement.

6

### 4. *Vandevelde's apprehension*

Vandevelde said he then crossed the highway to a neighbor's house, where people were home. He asked them if he could use their phone and told them his car was broken down. He also asked for directions to the silos where he believed he left his car. But he said, "[T]hey left and the sheriff came."

A sergeant from the Atchison County Sheriff's Office described how Vandevelde was apprehended. After the Whites contacted law enforcement about discovering Vandevelde in their shed, the sergeant began searching for Vandevelde in the area. He met a canine handler who was dispatched to assist. Eventually, he spotted Vandevelde standing on the side of the road. Vandevelde turned, looked at him, and then ran into the tree lines. The sergeant was in a marked patrol vehicle, but his lights were not activated. He got out and yelled for Vandevelde to come out of the trees and talk to them, to see what was going on. Eventually, he told Vandevelde they had a dog which they would send in if he did not come out.

After Vandevelde did not come out of the trees, officers leashed up the dog and used the dog to track Vandevelde. They found Vandevelde kneeling or hunched down, trying to hide himself. Once the officers located him, Vandevelde was cooperative, and they took him into custody. Vandevelde admitted he went into the trees and hid when he saw the officers on the road, claiming he "was a little shook up" after being held at gunpoint and "didn't know what the hell was going on."

When Vandevelde was taken into custody, several items were found on his person including an uncashed payroll check which listed B.J.'s Social Security number, an envelope with B.J.'s name written on it, a set of keys, and a clean Golden Eagle Casino card belonging to Markayla Boldridge.

5. *The Davidson property and Boldridge's car*

Vandevelde's problems did not stop when he was taken into custody. After an investigation began, law enforcement tied issues from another residence in the area to Vandevelde. Around 11 a.m. on June 29, Atchison County law enforcement responded to a call from Carl Davidson about a burglary. Davidson told officers someone had broken into his house that day while he was asleep. The officers investigated the outside of the home and discovered a ladder was positioned to gain entry through a window. Davidson said the ladder had not been there before.

When the officers took a closer look at the window, they located a hammer and observed pry marks consistent with the sharp edge of the hammer. Davidson told the officers the hammer came from the back of his pickup truck. In describing what occurred, Davidson stated he saw a "shadow or a figure" through a mirror and yelled "'who's there.'" The intruder ran through the house and left. According to Davidson, many items had been knocked over or were out of place.

Later, Davidson called the officers back to his home after he noticed there was something wrong with his truck and a car on his property owned by Boldridge (the casino card owner). Boldridge is married to Davidson's cousin, and she had left the vehicle with Davidson for some repairs. At trial, Davidson noted some things were broken inside the car. A responding officer also noticed Davidson's truck had a hubcap missing.

In talking about Boldridge's car, an officer at trial stated the driver's side door was cracked open and according to Davidson "some items had appeared to be moved around." The officer testified there was a cigarette box and a receipt laying on the ground next to the car. The middle console of the car was also open. Davidson told the officers both the car door and console had been shut, so he found it suspicious when he discovered them

open. A water jug was also found near the car, which Davidson said was not his nor did he know where it came from.

When asked about her Golden Eagle Casino player card which had been discovered in Vandevelde's possession, Boldridge testified she had more than one. She said she normally keeps them in the visor of her car or her purse. She also testified she had not left any Golden Eagle Casino cards "laying around on a country road" nor had she thrown any of the cards out her car window.

The officer who retrieved Vandevelde's vehicle testified that it drove just fine, even with the power steering issue.

*Vandevelde's charges, conviction, and appeal*

A jury convicted Vandevelde of aggravated burglary of Davidson's home, burglary of Boldridge's car, burglary of Weber's shed, felony theft of Weber's chainsaw, criminal trespass of the Whites' shed, theft of B.J. White's check, and theft of Boldridge's casino card. Given Vandevelde's criminal history and the Kansas Sentencing Guidelines grid box each of Vandevelde's crimes were placed in, the district court sentenced Vandevelde, in total, to 83 months in prison.

Vandevelde timely appealed.

REVIEW OF VANDEVELDE'S APPELLATE CHALLENGES

I. *Was there sufficient evidence for the jury to convict Vandevelde?*

A. *Standard of review*

When examining the sufficiency of the evidence in a criminal case, an appellate court will review all evidence in the light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. Appellate courts should: (1) not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence and (2) "only look to the evidence in favor of the verdict to determine whether the essential elements of a charge are sustained." *State v. Zeiner*, 316 Kan. 346, 350, 515 P.3d 736 (2022). This court will only reverse a guilty verdict "in rare cases" when "the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt." 316 Kan. at 350.

B. *Analysis*

Vandevelde argues the State presented insufficient evidence for a reasonable jury to find him guilty on any of his felony convictions. But he ignores evidence and asks us to reweigh it, which we cannot do.

1. *There was sufficient evidence to convict Vandevelde of aggravated burglary of Davidson's home.*

Vandevelde first argues there was insufficient evidence presented to convict him of aggravated burglary of Davidson's home. He does not deny a crime occurred—he denies he was the one who committed it. The State theorized that the Davidson intruder was the same person who trespassed into Boldridge's car. But Vandevelde describes the State's case against him as "tenuous" and claims the primary evidence linking him to the Davidson house—Boldridge's casino card—is weak. Since Boldridge testified it was

10

common for her to leave her casino cards in the visor of her vehicles and one of her cards was found on Vandevelde's person when he was arrested, the State pinned Vandevelde as the Davidson residence intruder.

Vandevelde is correct the evidence linking him to Davidson's property is not as strong as, for instance, the video surveillance of him entering the Weber property. But he is mistaken to say that Boldridge's casino card was the only evidence on which the jury could rely to find he was the intruder. There were also discrepancies between Vandevelde's story and the version told by other witnesses. First, Boldridge told the jury she had never left a card on a country road or thrown one out of her car. She testified she normally left them in her car—which appeared to have been broken into while on Davidson's property—or her purse. This testimony conflicts with Vandevelde's assertion that he found the card by a bridge. Vandevelde also stated he used the card to pick mud off his dirty boot since it had been raining. But law enforcement told the jury when they arrested Vandevelde, the card was clean.

Other evidence points to Vandevelde being the Davidson intruder. For instance, Davidson testified he saw a "stocky" intruder "through the mirror." Davidson's neighbor, Knowles, also recalled the man on his property on June 29 looked like a "stocky built man." And Vandevelde admitted he was on Knowles' property on June 29 and talked to him.

The timeline and proximity of the homes also supports the jury's finding. The Weber, Knowles, and Davidson houses are near each other. After the sun came up, Vandevelde said he started walking towards houses. Supposedly, the first one he arrived at was Weber's. He then walked by Knowles' house, while it was still "pretty early" in the morning. He returned to Knowles' house "after lunch," when he talked to Knowles. Between the Weber house and his return to Knowles' house, he maintained he just "walk[ed] up and down roads" and "fell asleep" at some point.

11

Davidson called law enforcement right after the intruder left, around 11 a.m. Vandevelde allegedly was walking around at this time close to the Weber and Knowles properties—which also made him close to the Davidson property. Vandevelde's only alibi during the time of the Davidson burglary was his assertion that he was walking around near the Davidson home looking for his car. And he admitted to visiting the Weber and Knowles properties that day.

To conclude Vandevelde was not the Davidson residence intruder would mean the jury would have to believe another "stocky" individual committed the burglary on the same day near other houses where Vandevelde admitted visiting *and* that Boldridge lost her casino card near a bridge on a country road. We do not believe this version of events is reasonable, especially since we must view the evidence in the light most favorable to the State.

There was sufficient evidence presented to convict Vandevelde of aggravated burglary of Davidson's home. Circumstantial evidence paired with direct evidence showing Boldridge's casino card on Vandevelde's person when he was arrested supports this conclusion. Although Vandevelde believes these are "tenuous link[s]," the Kansas Supreme Court has "often state[d] that even the gravest offense can be based entirely on circumstantial evidence." *Zeiner*, 316 Kan. at 350 (citing *State v. Banks*, 306 Kan. 854, 858-59, 397 P.3d 1195 [2017]). There are several pieces of circumstantial evidence that point to Vandevelde being the Davidson intruder and a plethora of direct evidence showing he was in the area during the time of the Davidson burglary.

But Vandevelde still maintains he could not have committed the burglary because he is hard of hearing. Vandevelde points out that in opening statements his attorney told the jury he used hearing aids and had issues communicating if he is not looking at who is speaking to him. Since he was hard of hearing, he asserts he could not have been the

intruder because it would have been impossible for him to hear Davidson yell out, "'[W]ho's there?'" According to Davidson, the intruder left after Davidson called out.

There are several issues with Vandevelde's argument. To begin, the record does not show Vandevelde was hard of hearing on June 29, 2020—or at the very least, he does not point us to a place in the record showing he needed hearing aids that day. But even if he was hard of hearing on this date, there is no indication he was not wearing his hearing aids. Indeed, the evidence shows he could have conversations on this date with the individuals he encountered. B.J. White and the officers who apprehended and questioned Vandevelde all testified Vandevelde did not appear to have any problems hearing when they talked with him. Based on this evidence, it would be reasonable for the jury to conclude Vandevelde could have heard Davidson yell.

After reviewing the evidence in the light most favorable to the State, we find there was sufficient evidence for a reasonable jury to convict Vandevelde of aggravated burglary of the Davidson home.

> 2. *There was sufficient evidence to convict Vandevelde of burglary of Boldridge's car.*

In discussing his argument on the sufficiency of the evidence for his aggravated burglary charge, Vandevelde briefly mentions his felony conviction for burglary of Boldridge's car. Like the aggravated burglary charge, he claims the State failed to prove he was the perpetrator. Again, Vandevelde appears to concede a burglary occurred but maintains it was not committed by him. He says no evidence links him to the interior of Boldridge's car and repeats his arguments that Boldridge did not unequivocally state the casino card found on Vandevelde was in her car. And he adds that neither Boldridge nor Davidson established the damage to the car happened on June 29, arguing perhaps they simply noticed it that day.

But Vandevelde is asking us to hold the State to a higher standard of proof than Kansas law requires. Circumstantial evidence is not fatal to a successful prosecution. *State v. Gibson*, 311 Kan. 732, 742, 466 P.3d 919 (2020). Although there is some danger in relying on circumstantial evidence—our Supreme Court also pointed out in *Gibson* that courts must "remain vigilant against inference stacking, which is impermissible because when the State asks a jury to make a presumption based on another presumption, the State fails to carry its burden to present sufficient evidence"—the State did not rely on inference stacking here. 311 Kan. at 742.

Like the aggravated burglary conviction, we find there was sufficient evidence linking Vandevelde to the vehicle burglary. Even though the majority of it was circumstantial, Boldridge's casino card was found on Vandevelde's person when he was arrested and Boldridge testified she normally stored her casino cards in her car. The fact that the card was clean when Vandevelde was arrested conflicts with his story that he used it to clean mud from his shoes, Vandevelde was around the Davidson residence where the car was located, and the timeline is consistent with the conclusion that Vandevelde was on the Davidson property and committing these crimes. Given that the car was discovered with noticeable changes—the driver's side door was ajar and items were laying nearby on the ground—it seems likely the damage was discovered on the day it occurred, instead of a later date.

In another case where our Supreme Court found circumstantial evidence was sufficient to uphold a conviction, it described the standard we use to view the sufficiency of circumstantial evidence:

> "Circumstantial evidence, in order to be sufficient, 'need not rise to that degree of certainty which will exclude any and every other reasonable conclusion.' *Casey v. Phillips Pipeline Co.,* 199 Kan. 538, 551, 431 P.2d 518 (1967). Instead, circumstantial evidence 'affords a basis for a reasonable inference by the jury' regarding a fact at issue.

199 Kan. at 550 (explaining circumstantial evidence 'tends to prove a fact in issue by proving other events or circumstances which, according to the common experience of mankind, are usually or always attended by the fact in issue')." *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016).

Applying this standard, along with the charge that we must review all evidence in the light most favorable to the State, we find the circumstantial evidence here provided a basis for the jury to infer Vandevelde was the burglar. See *Banks*, 306 Kan. at 858 ("When the sufficiency of evidence is challenged in a criminal case, the appellate court reviews all the evidence in the light most favorable to the State."). And like in *Logsdon*, Vandevelde pointed out the circumstantial nature of the evidence to the jury in closing. So the jury was aware of this weakness in the State's case and able to consider this factor when weighing the evidence. We, on the other hand, cannot weigh the evidence which appears to be what Vandevelde is asking us to do.

Consequently, we find there was sufficient evidence to convict Vandevelde of burglary of Boldridge's car.

### 3. *There was sufficient evidence to convict Vandevelde of burglary of Weber's shop and felony theft of Weber's chainsaw.*

Vandevelde next contends there is insufficient evidence to convict him of burglary and theft of the chainsaw at Weber's property. To prove the crime of burglary of a nondwelling, the State was required to prove the defendant entered a building without authority and did so with the intent to commit a theft therein. K.S.A. 2019 Supp. 21-5807(a)(2)(A). And to prove the crime of theft, the State was required to prove the defendant obtained or exerted unauthorized control over property, a Stihl chainsaw, with the intent to permanently deprive Weber of use or benefit of that property. K.S.A. 2019 Supp. 21-5801(a)(l). Vandevelde does not necessarily point out which element of either crime lacks sufficient evidence. Since he admits the chainsaw was moved but contests he

15

was the one who did it, we will focus on whether there was sufficient evidence to show he took it. Further, Vandevelde seems to question the State's trial theory that he intended on committing a felony when he entered the shop.

First, Vandevelde admitted entering the shop on June 29. And both his testimony and the video surveillance establish he was rummaging around Weber's property looking for items that morning. Vandevelde also admitted he purposefully unplugged the surveillance video because he "knew [he] wasn't supposed to be in there." Weber testified he noticed some of his tools had been bagged up and placed in unusual places—places that support the State's theory that Vandevelde intended to return and retrieve them. And Weber also testified he was sure the chainsaw was in the shed that morning because he intended on using the chainsaw that day before opting to use hand tools.

While Weber did not notice the chainsaw missing on June 29, he did notice it about a week later. According to Weber, nothing suspicious happened between Vandevelde entering the shop and when he discovered the chainsaw was missing. And the chainsaw was discovered on Knowles' property, which Vandevelde admitted he visited.

Since the evidence demonstrates Vandevelde was in the shop that day and the chainsaw was in the shop that morning but missing after Vandevelde left the shop, it would have been reasonable to conclude Vandevelde was the individual who took the chainsaw. To the degree Weber's and Vandevelde's stories conflict, it was up to the jury to resolve that credibility determination. See *Zeiner*, 316 Kan. at 350. And it would not have been unreasonable for the jury to believe Weber's story given the evidence.

This conclusion is buttressed by the fact that Vandevelde told the jury after he unplugged the surveillance camera, the next house he went to was Knowles'. In fact, he stated he went to Knowles' property twice after leaving the Weber property. Because the

16

chainsaw was found on Knowles' property, it would have been reasonable for the jury to conclude Vandevelde took the chainsaw and hid it on Knowles' property for later retrieval. The timeline suggesting Vandevelde committed these two crimes therefore aligns with Vandevelde's testimony about his travels that day.

Second, Vandevelde challenges the State's overall theory regarding the Weber burglary. He specifically contends the State's theory "was that Mr. Vandevelde entered the shed with the intent to steal tools, but then 'strategically' staged the tools by placing some inside the shed near the door, but placing the chainsaw in the woods because he was lost and could not be seen carrying it around with him." Or more simply, as the State put it in closing arguments, its theory is that Vandevelde put the tools by the door and in the middle of the shop so he could find his car and come back for them later. It is unclear whether Vandevelde is contesting the intent element of the burglary charge or whether he is simply arguing the State's theory does not make sense. We address each possibility.

First, there is circumstantial evidence suggesting Vandevelde entered Weber's shop with the intent to commit a felony. When Vandevelde arrived at Weber's residence, video surveillance depicted him rummaging through Weber's truck. It also showed him entering the shop. A negative inference can be drawn from Vandevelde unplugging the surveillance camera, supporting the jury's conclusion that his intent when entering the shop was criminal. Although no direct evidence shows Vandevelde intended on committing a felony inside Weber's shop, direct evidence of one's subjective state of mind is rarely available. "Intent is usually proven by inference arising from circumstantial evidence." *State v. Gonzalez*, 311 Kan. 281, 288, 460 P.3d 348 (2020). And we find there was sufficient circumstantial evidence showing Vandevelde intended to commit a felony when he entered Weber's shop.

Next, Vandevelde believes the State's "theory defies reason" because Vandevelde claimed he did not know where his car was. He also asserts this "staging theory" does not

17

make sense because the tools were left in the shop and the chainsaw was located on Knowles' property. But a jury could have found Vandevelde took the chainsaw and left the tool bags because he wanted the chainsaw more or the bags of tools were heavier. The tool bags included objects like a trim gun, three hammer drills with different volt levels, and drill bits. And just like other conflicting aspects of Vandevelde's story, the jury might not have believed Vandevelde's testimony that he was lost or did not know where he had left his car.

Direct evidence shows Vandevelde entered Weber's shed on June 29, 2020: Vandevelde admitted being in the shed; video surveillance showed Vandevelde rummaging through items on Weber's property before he went into the shop; Weber's chainsaw was missing after Vandevelde had been in the shed; the chainsaw was located on Knowles' property, the same area Vandevelde visited twice after he left Weber's shop; and Vandevelde admitted he unplugged the video surveillance before leaving the shop. The State therefore proffered sufficient evidence to show Vandevelde committed burglary and theft of the chainsaw at Weber's property.

As such we find the State proffered sufficient evidence to support Vandevelde's felony convictions of aggravated burglary of the Davidson home, burglary of Boldridge's motor vehicle, burglary of Weber's shop, and theft of Weber's chainsaw.

II. *Did the district court err in denying Vandevelde's motion for judgment of acquittal?*

At the close of the State's case-in-chief, Vandevelde moved for acquittal on the charges of aggravated burglary and theft of Weber's check. The district court denied the motion but amended the theft charge from a felony to a misdemeanor. After the denial, Vandevelde put on evidence in his defense, in part testifying that he had never been inside Davidson's home. He later renewed the motion after the prosecution's rebuttal and was denied again.

18

Although on appeal Vandevelde maintains he moved for acquittal on the charge of burglary of Boldridge's motor vehicle at the close of the State's case, the trial transcript does not bear this out. Our review of the record reveals Vandevelde did not move for acquittal on this charge until after trial. Since Vandevelde is only claiming the district court erred in denying his motion for acquittal at the end of the prosecution's case-in-chief, we can only address the aggravated burglary charge.

A. *Preservation and standard of review*

1. *The standard of review for assessing error in denying a motion for acquittal is the same as the standard for a challenge to the sufficiency of the evidence.*

A challenge to the denial of a motion of acquittal is, in essence, a challenge to the sufficiency of the evidence. The two challenges share the same standard of review which asks whether a rational fact-finder could find the defendant guilty after viewing the evidence in a light most favorable to the prosecution. *State v. Frantz*, 316 Kan. 708, 736, 521 P.3d 1113 (2022).

2. *We must review all the evidence presented in Vandevelde's trial, not just the evidence proffered by the State during its case-in-chief.*

The Kansas Supreme Court has "held that when a defendant unsuccessfully moves for judgment of acquittal at the close of the State's evidence and then proceeds to present evidence, the defendant waives any error in denial of the motion." *Frantz*, 316 Kan. at 732 (citing *State v. Blue*, 225 Kan. 576, 578, 592 P.2d 897 [1979]). But "if the motion is renewed at the close of all the evidence, it is only the denial of the later motion that may be claimed as error." 2A Wright & Henning, Federal Practice and Procedure: Criminal 4th § 463 (2009). So if a defendant renews his or her motion at the close of all the evidence, "the trial court should consider *all* of the evidence in ruling upon that motion." *Blue*, 225 Kan. at 578. The operative effect of *Blue*'s rule, therefore, is that once a

19

defendant presents a defense in their case-in-chief, he or she "'waives the right to have the court review the denial of directed verdict based *solely* on the evidence presented in the State's case-in-chief.'" (Emphasis added.) *Frantz*, 316 Kan. at 734 (quoting *State v. Phillips*, 416 S.C. 184, 191 n.7, 785 S.E.2d 448 [2016]).

The court later partially modified *Blue*'s "rule to provide that a defendant does not waive error if he or she presents only rebuttal evidence confined to the substance and credibility of the witnesses for the State or a codefendant and does not try to refute any elements of proof adduced in the State's case." *Frantz*, 316 Kan. at 732-33 (citing *State v. Copes*, 244 Kan. 604, 610-11, 772 P.2d 742 ([1989]).

Vandevelde acknowledges that since he moved for acquittal and put on evidence attempting to refute the aggravated burglary charge, he waived any error in denial of the motion under *Blue*. He also understands this court is duty-bound to follow *Blue*'s rule. But he nevertheless urges us to deviate from *Blue* and "review only the prosecution's case in chief" to determine if the district court erred in denying his renewed motion. He believes there is sufficient indication from the Kansas Supreme Court that it intends on departing from *Blue*. This court is not required to follow Kansas Supreme Court precedent if "there is some indication that the court is departing from its previous position." *State v. Beck*, 32 Kan. App. 2d 784, 788, 88 P.3d 1233 (2004).

To show the Kansas Supreme Court is departing from *Blue*, Vandevelde cites a concurring opinion in *Frantz*, 316 Kan. at 748-51. The concurring opinion, written by Justice Stegall and joined by Justice Rosen and Chief Justice Luckert, noted it would use *Frantz* as a vehicle "to abrogate the *Blue* waiver rule." *Frantz*, 316 Kan. at 751 (Stegall, J., concurring). It stated so even though the State failed to brief the *Blue* waiver rule and preserve the issue for appeal. *Frantz*, 316 Kan. at 735. The concurrence concluded *Blue*'s waiver rule created fairness problems for the defendant. *Frantz*, 316 Kan. at 749 (Stegall, J., concurring). Justice Stegall contends *Blue*'s rule violates both the United States and

20

Kansas Constitutions' prohibition on double jeopardy because it permits the State to "get two bites at the conviction apple." *Frantz*, 316 Kan. at 750 (Stegall, J., concurring).

A concurrence approved by three justices, however, cannot overturn Kansas Supreme Court caselaw because "the doctrine of stare decisis binds us to follow the majority decisions, not concurrences." *State v. Posa*, 61 Kan. App. 2d 250, 258, 500 P.3d 1212 (2021). Although Vandevelde contends the Kansas Supreme Court will overturn *Blue* when "given the opportunity in a briefed case, and review this issue solely from the [S]tate's case in chief," there is no indication the current majority of the court will pursue this path. Consequently, we cannot depart from *Blue*'s rule and only review evidence in the State's case-in-chief to determine whether the district court erred in denying Vandevelde's motion for acquittal.

> B. *The State presented sufficient evidence for a rational fact-finder to find Vandevelde guilty of the aggravated battery charge.*

Since we are required to analyze all the evidence under *Blue* and we employ the same assessment as used in Issue I's sufficiency of the evidence argument, we likewise conclude the district court did not err in denying Vandevelde's motion for acquittal. The State presented sufficient evidence to convict Vandevelde of aggravated burglary because it circumstantially tied Vandevelde's possession of Boldridge's casino card to his presence on the Davidson property, it presented direct evidence via Weber's video surveillance of Vandevelde being near the Davidson property that day, and Davidson testified the burglar was stocky while Knowles independently identified Vandevelde as a stocky man.

Vandevelde attempts to highlight any problems with *Blue*'s holding by illuminating the facts in his case. According to Vandevelde, when he presented his defense case-in-chief, it "in turn opened the door to the prosecution to present evidence" of his prior interview with law enforcement. He maintains this interview "contained

inconsistencies" with his testimony. Vandevelde argues this rebuttal evidence should not be considered. But there are two problems with Vandevelde's proposition: First, as already discussed, we are duty-bound to follow *Blue* and can therefore consider law enforcement's interview with Vandevelde. But second, even setting aside the law enforcement interview, we conclude there was sufficient evidence to convict Vandevelde of aggravated burglary based on Vandevelde's possession of the casino card, Weber's video surveillance, and the testimony of the homeowners and Boldridge. As a result, we conclude the district court did not err in denying Vandevelde's motion for acquittal.

III. *Did the district court err in failing to sua sponte instruct the jury on affirmative defenses?*

A. *Preservation and standard of review*

Vandevelde argues the district court erred because it did not sua sponte instruct the jury on two affirmative defenses: necessity and compulsion. He argues these defenses absolve him of liability for his criminal trespass onto the Whites' property.

Kansas appellate courts review instructional error claims in multiple steps: First, we look to whether the issue was properly preserved. Vandevelde admits he did not ask the district court to give the two instructions he argues on appeal. This omission does not preclude appellate review, but it means we will afford relief only if the absence of either instruction amounts to clear error. K.S.A. 22-3414(3); *State v. Elliott*, No. 123,609, 2022 WL 1122687, at *2 (Kan. App. 2022) (unpublished opinion). Second, we consider whether the instructions were legally and factually appropriate. If so, we then consider whether the court's failure to give either instruction was clear—meaning reversible— error. *State v. Craig*, 311 Kan. 456, 464, 462 P.3d 173 (2020).

Although Vandevelde acknowledges we generally review claims involving an unrequested jury instruction for clear error, he argues we should instead employ a

constitutional harmless error test because he contends the court's error "implicated his constitutional rights to present a defense and to bodily integrity." And he inexplicably cites *State v. Kleypas*, 305 Kan. 224, 382 P.3d 373 (2016), for this proposition. While the portion of *Kleypas* he cites describes the constitutional harmless error test in general, it does so in the context of reviewing Kleypas' challenge to a defective warrant. 305 Kan. at 257. Later in the opinion, our Supreme Court noted that when a defendant fails to request an instruction, we apply the clearly erroneous standard and determine whether we are firmly convinced the jury would have reached a different verdict had the instruction been given. 305 Kan. at 306.

Given Kansas caselaw, and Vandevelde's failure to point out any case where a court applied the harmless error standard to an unrequested jury instruction, we will apply the clear error standard to his instructional error claim. See *State v. Murrin*, 309 Kan. 385, 392, 435 P.3d 1126 (2019) (clear error is the proper test for unpreserved instructional error claim). And Vandevelde has the burden to convince us the jury would have reached a different verdict but for the instructional error. See *State v. Berkstresser*, 316 Kan. 597, 605, 520 P.3d 718 (2022).

B. *We decline to find the necessity defense legally or factually appropriate.*

Vandevelde first argues the district court erred by not instructing the jury on the "common law defense of necessity." But he faces an uphill battle. The Kansas Supreme Court has repeatedly declined to adopt a necessity affirmative defense. And even if it had, the facts of the case do not warrant application of the defense.

1. *We follow precedent which has declined to find the necessity defense legally appropriate.*

The Kansas Supreme Court and this court have expressly and repeatedly declined to adopt a necessity defense. *State v. Roeder*, 300 Kan. 901, 914-19, 336 P.3d 831 (2014);

23

*City of Wichita v. Tilson*, 253 Kan. 285, 291-96, 855 P.2d 911 (1993). While we have not definitively stated whether Kansas would *ever* recognize such a defense, we have declined to do so when the facts of the case did not warrant application of the defense. See *Roeder*, 300 Kan. at 919; *Tilson*, 253 Kan. at 291; *State v. Hunt*, No. 106,296, 2012 WL 3966535, at *2-4 (Kan. App. 2012) (unpublished opinion); *City of Wichita v. Holick*, No. 95,340, 2007 WL 518988, at *7 (Kan. App. 2007) (unpublished opinion).

Because, as explained below, we find the necessity defense was not factually appropriate here, we similarly decline to reach the issue of whether the Kansas Supreme Court would recognize a necessity defense under other circumstances.

> 2. *The necessity defense is not factually appropriate because Vandevelde did not offer evidence that his heatstroke was "imminent" when he entered the Whites' shed.*

Although a defendant is entitled to an instruction on every affirmative defense, "the defendant must also show that this affirmative defense was supported by competent evidence—i.e., that it was factually appropriate." *State v. Keyes*, 312 Kan. 103, 107-08, 472 P.3d 78 (2020). Competent evidence is defined as evidence that could allow a rational fact-finder to reasonably conclude the defense applies. K.S.A. 21-5108(c); *State v. Harris*, 313 Kan. 579, 592, 486 P.3d 576 (2021).

When assessing whether to recognize the defense in *Hunt*, this court concluded the elements of the common-law necessity defense are:

> "'(1) that the defendant was faced with a choice of evils and chose the lesser evil, (2) the defendant acted to prevent imminent harm, (3) the defendant reasonably anticipated a direct causal relationship between his conduct and the harm to be averted, and (4) the defendant had no legal alternatives to violating the law.'" 2012 WL 3966535, at *4 (quoting *Holick*, 2007 WL 518988, at *3).

24

The primary disagreement between the parties here relates to the first element, which requires the defendant to face a choice of evils and choose the lesser evil. *Roeder*, 300 Kan. at 917. Vandevelde contends the evil he sought to avoid was heatstroke after walking around in the sun that day. The "lesser evil" Vandevelde contends he took was criminal trespass by entering the Whites' shed to get out of the sun.

North Carolina has recognized the necessity defense is appropriate to "'protect life or limb or health in a reasonable manner and with no other acceptable choice.'" *State v. Thomas*, 103 N.C. App. 264, 265, 405 S.E.2d 214 (1991). And there are facts to suggest Vandevelde's health was of concern. Vandevelde testified "[A]t one point I thought I had a stroke." The Whites also described Vandevelde as looking exhausted and limping.

The State attempts to discount this testimony by arguing Vandevelde did not put on evidence he "was on the brink of suffering heatstroke" when he entered the shed. The State points to a lack of medical evidence proffered by Vandevelde about this condition. It believes he failed to illustrate what a heatstroke is and what the symptoms are. But the State cites no authority dictating medical evidence is required to maintain a necessity defense. Although the State is correct that there is little evidence demonstrating Vandevelde was on "the brink" of heatstroke, that analysis is better saved for the imminence of the "evil," i.e., the second prong of the necessity test. Because Vandevelde testified about his waning health and that testimony was partially corroborated by the Whites, a reasonable jury could conclude Vandevelde was facing a health-related evil.

The State also argues Vandevelde had a choice between criminally trespassing on the Whites' property and suffering health problems. The necessity defense "does not arise from a 'choice' of several courses of action . . . . It can be asserted only by a defendant who was confronted with . . . a crisis which did not permit a selection from among several solutions, some of which did not involve criminal acts." *United States v. Seward*, 687 F.2d 1270, 1276 (10th Cir. 1982).

25

Vandevelde had other choices that day which did not require him to trespass into the Whites' shed and sleep there. He could have waited near the Whites' porch. If Vandevelde was concerned about his health, he could have asked Knowles to call emergency services, family, or friends. Regardless of whether Vandevelde committed the Davidson burglary, since the Davidson house was close to the area Vandevelde was traversing, he could have tried knocking on the Davidson door; or he could have found shade somewhere by a tree. The Whites' shed was not climate controlled and even though it may have offered a brief break from the sun, it is not as if the shed offered him dramatically different circumstances from the outdoors. Indeed, B.J. White testified the shed "would have been even hotter" than the conditions outside. Admittedly, none of these alternatives are perfect but nevertheless, Vandevelde had a choice between exploring any number of these options and criminally trespassing into a hot shed which was not climate-controlled.

The most dispositive issue is the imminence element. No evidence supports Vandevelde's contention that he was going to imminently suffer a heatstroke if he did not enter the shed. He argues now the harm to his health was imminent because he believed at one point that he had suffered a heatstroke. But the problem with relying on this testimony from Vandevelde is that he never offered any context or temporal timeframe for when he believes he suffered heatstroke. When he stated he thought he had suffered a stroke "at one point," he said so when his attorney was asking him about the officers' testimonies that he ran from law enforcement and hid in a tree line. He was explaining why he disputed this claim—arguing he could not have run given his physical condition and instead only walked into the tree line. Given this is the only time he claimed to have suffered a heatstroke, it is difficult to determine whether he claims to have suffered the heatstroke before, during, or after he went into the Whites' shed. Since no facts reflect the imminence of the heatstroke at the time he entered the Whites' shed, he failed to satisfy this element of the defense.

Vandevelde also asserts the third element of the defense is met because he "reasonably anticipated the direct causal relationship between his conduct, seeking shade, and the harm to be averted, heat related bodily harm." The State disagrees because it maintains he put on no "evidence of the risk of the imminent onset of heatstroke." Again, since there are no facts to suggest when the alleged heatstroke occurred, specifically whether it was before or around the time he entered the Whites' shed, it is difficult to establish a causal relationship between the alleged heatstroke and the decision to enter the shed.

Finally, Vandevelde maintains the fourth element is satisfied because he had no other alternatives than to enter the Whites' shed. The State disagrees, largely citing other choices Vandevelde could have pursued. It mostly restates the alternatives it offered in its analysis of the first element. And again, the State makes a valid point. Vandevelde has failed to show he had no legal alternatives to violating the law. He had several opportunities to ask people for help or to contact law enforcement to help him locate his vehicle. We cannot say he satisfied this element of the defense either.

Ultimately, there is little evidence supporting Vandevelde's claim that he was suffering imminent medical issues and thus had no choice but to enter the Whites' shed to resolve or alleviate those issues. Although he proffered corroborating testimony that he looked exhausted and it was hot outside, he provided no evidence he was suffering any symptoms of heatstroke nor did he develop testimony on when his alleged heatstroke happened, which makes it nearly impossible to conclude the evil he was facing was imminent.

For these reasons, we find the district court did not err in failing sua sponte to instruct the jury on the necessity defense.

C. *The district court did not err in failing to instruct on the compulsion defense.*

Another jury instruction Vandevelde argues the district court should have sua sponte given the jury is the one which explains the affirmative defense of compulsion. Unlike the necessity defense, the compulsion defense is codified in K.S.A. 21-5206(a). It states:

> "A person is not guilty of a crime other than murder or voluntary manslaughter by reason of conduct which such person performs under the compulsion or threat of the imminent infliction of death or great bodily harm, if such person reasonably believes that death or great bodily harm will be inflicted upon such person or . . . if such person does not perform such conduct." K.S.A. 21-5206(a).

The compulsion defense "suggests duress or coercion by a third party that forces the defendant to commit a crime in order to protect the defendant or the defendant's family from harm by a third party." *State v. Martin*, No. 85,527, 2001 WL 37132061, at *2 (Kan. App. 2001) (unpublished opinion). In *Martin*, we relied on this characterization of the defense because our Supreme Court, in *State v. Hunter*, 241 Kan. 629, 640-41, 740 P.2d 559 (1987), used the description of the defense in LaFave and Scott, Handbook on Criminal Law, p. 374 (1972), which specified the compulsion or threat is "'an unlawful threat from another human being.'" See 2001 WL 37132061, at *3. This interpretation also aligns with the language in K.S.A. 21-5206(a), which states that, to claim the defense, the defendant must have acted "under the compulsion or threat of the imminent *infliction* of death or great bodily harm." (Emphasis added.) The use of the term "infliction" implies an actor—a person, not nature—would take action to cause "death or great bodily harm." Whereas the language of the necessity defense describes the threat in a more passive way (including that "'the defendant was faced with a choice of evils and chose the lesser evil'" and "'the defendant acted to prevent imminent harm'"). *Hunt*, 2012 WL 3966535, at *4.

28

While the law in Kansas on this issue is not well-developed, other jurisdictions have explained "[t]he major distinction between the defenses of compulsion and necessity is that in the former the source of the coercive power is from a human being and in the latter the coercive power has traditionally arisen from the forces of nature." *People v. Cater*, 78 Ill. App. 3d 983, 989, 398 N.E.2d 28 (1979); see also *McMillan v. State*, 428 Md. 333, 361, 51 A.3d 623 (2012) (noting the defense of "[n]ecessity is similar to duress, except that the compulsion to act comes from 'the physical forces of nature [storms, privations] rather than from human beings'"); *People v. Hocquard*, 64 Mich. App. 331, 337 n.3, 236 N.W.2d 72 (1975) ("The source of compulsion for duress is the threatened conduct of another human being, while the source of compulsion for necessity is the presence of natural physical forces.")

The compulsion defense is available if coercion or duress is present, imminent, impending, and continuous. *State v. Lowry*, 317 Kan. 89, 99, 524 P.3d 416 (2023). The coercion or duress must also be of such nature to induce "well-grounded apprehension of death or serious bodily injury if the act is not done," and there "must be no reasonable opportunity to escape the compulsion without committing the crime." *State v. Hutto*, 313 Kan. 741, 748, 490 P.3d 43 (2021).

> 1. *The compulsion defense was legally inappropriate because Vandevelde does not claim coercion or threat by another person.*

Vandevelde cites the source of his alleged compulsion to illegally enter the Whites' shed was "heat and sun, [which] were continuous and present throughout the entire day." Yet he cites no authority to support his proposition that the defense of compulsion applies when the source of the compulsion is nature and not another person. And as explained above, Kansas has not recognized this defense under these circumstances. Therefore, we find the compulsion defense was not legally appropriate here.

### 2. *Factually inappropriate*

Even if we recognized Vandevelde's alleged compulsion to act based on a natural threat as legally appropriate, the facts of his case do not warrant application of the compulsion defense. Unlike the necessity defense, which has not been adopted in Kansas and whose boundaries are unclear, the compulsion defense in Kansas is well explored.

While having a heatstroke could easily qualify as a "serious bodily injury," the heatstroke Vandevelde contends occurred at some point that day was not ongoing. Indeed, when he testified at trial he thought he suffered a stroke sometime in the day, he offered no indication of when that occurred except for noting it happened before he hid from law enforcement. He also never said his heatstroke was ongoing while he slept in the Whites' shed. At trial, he made no connection that his purported heatstroke was "present, imminent, and impending . . . [and] continuous" when he entered the shed and slept there. See *Lowry*, 317 Kan. at 99. And as with the necessity defense, Vandevelde failed to develop a sufficient record on which a jury could reasonably find he had to enter the Whites' shed to prevent imminent heatstroke.

Like the necessity defense, we do not find sufficient facts to support instructing the jury on the compulsion defense.

### D. *Conclusion*

Vandevelde has failed to persuade us that the district court erred in failing to sua sponte instruct the jury on either the necessity or compulsion defenses. Even if we found the instructions to be legally appropriate—which we decline to do—neither instruction is factually appropriate. We therefore find the district court was not obligated to instruct the jury on these defenses.

IV. *Did the prosecutor reversibly err in misstating the facts during closing argument?*

    A. *Preservation and standard of review*

Prosecutors cannot offend a defendant's right to a fair trial. *State v. Blevins*, 313 Kan. 413, 428, 485 P.3d 1175 (2021). Wide latitude should be given to prosecutors discussing evidence during closing arguments. *State v. Tahah*, 302 Kan. 783, 787, 358 P.3d 819 (2015).

A two-step test is used to assess alleged prosecutorial error. First, an appellate court determines whether the prosecutor erred. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). This prong is met when a prosecutor argues facts not in evidence. An appellate court must then consider whether the misstatement of facts constitutes plain error. *State v. Hall*, 292 Kan. 841, Syl. ¶ 5, 257 P.3d 272 (2011). If the prosecutor erred, it "is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record.'" *Sherman*, 305 Kan. at 109 (quoting *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011]). Here, if error is found, the State bears the burden of showing Vandevelde was not prejudiced.

    B. *Even though one statement by the prosecutor was made in error, neither statement Vandevelde mentions was prejudicial.*

        1. *The prosecutor's statement that "things were out of place" in Boldridge's car is not prejudicial.*

To begin, Vandevelde believes the prosecution misstated evidence in closing arguments when it stated, "So then we get to the burglary of [Boldridge's] vehicle. And that's [*sic*] the defendant entered a vehicle. Well, we know that this vehicle was entered.

31

We know that the door was ajar. *We know that things were out of place, and we know things were moved around*." (Emphasis added.)

Vandevelde poses two issues with this statement. First, he believes neither Davidson nor Boldridge testified items were "out of place" or "moved around." According to him, Davidson never testified about items in Boldridge's car being moved and only that "there was [*sic*] a couple pieces broke inside the car." He also notes Boldridge testified she could not remember if the inside of the vehicle was left the way it was found during the investigation.

The prosecution correctly stated that "things were out of place" because Davidson testified that inside the car, there were "a couple pieces broke" like "[t]rim pieces or something." He made this statement after describing that he walked around his property inspecting it after the burglary occurred. If items were broken in Boldridge's car, then it is accurate to say, "things were out of place." If things were in place, then items would not be broken. It is also fair to say that broken, out of place "things," would have been "moved around" from their original nonbroken state. "Move" can mean "to change the place or position of." Webster's New World College Dictionary 957 (5th ed. 2018). If items were broken, then those items would have changed position from their original state.

Besides pointing out that Davidson testified Boldridge's vehicle had trim pieces broken, the State also points to testimony from law enforcement discussing the state of the vehicle. Deputy Cody Sprang stated a Malibu car door was ajar when it had been previously closed, he was informed the center console was open when it had been previously closed, and a cigarette box and receipt were located on the ground which were not there before the burglary. He also testified "some items had appeared to be moved around" inside the car.

32

Deputy Sprang's testimony buttresses Davidson's testimony. And it directly supports the prosecutor's statement because the deputy specified items had been "moved around." The only problem with solely relying on this testimony is that it appears Sprang mixed up car models because he made these statements when describing a Malibu car. Boldridge testified she owns an Impala. But the deputy likely misspoke because when he made these statements, he was discussing being on the Davidson property to investigate Davidson's "Ford F250 and Ms. Boldridge's vehicle." Further evidence of Sprang misspeaking is shown by Davidson's testimony. For instance, when asked what the make and model of Boldridge's car was, Davidson responded, "It's a Malibu. Chevy Malibu, I think, or Impala." So although Sprang misidentified Boldridge's vehicle, given the context of his testimony and Davidson's comment, we find Sprang's testimony supports the prosecutor's statements. But even without considering Sprang's testimony, we still find the statement supported by Davidson's testimony. Therefore, the prosecution correctly stated Boldridge's car had "things out of place" and "moved around."

Second, Vandevelde maintains it was problematic for the prosecution to phrase the statement as "'we know . . .'" because he believes that under *State v. Alfaro-Valleda*, 314 Kan. 526, 538, 502 P.3d 66 (2022), a prosecutor cannot give their opinion during closing argument. This is an incorrect reading of *Alfaro-Valleda* because there the Kansas Supreme Court held: "A prosecutor inferring from evidence and adding that 'we know' the inference is valid crosses the line by giving the prosecutor's opinion about the strength and meaning of the evidence." 314 Kan. at 540. The court reviewed each time the prosecutor stated, "we know," and it found the prosecution committed error. It concluded the prosecution erred because it "invited the jury to speculate about events not supported by the evidence." 314 Kan. at 544.

Here, when the prosecution stated, "we know," it was not inferring from evidence. There was evidence to support the prosecutor's statement that things in Boldridge's car were "out of place" and "moved around." The prosecutor did not state, for example, "we

know that because of Vandevelde, things were out of place and we know things were moved around." That would require an inference that Vandevelde was the individual who committed the burglary.

It is also very likely the prosecutor's repeated statement that "we know" was a verbal tic. In *Alfaro-Valleda*, the State argued the prosecutor's "we know" statements were simply verbal tics and were not made in error. 314 Kan. at 543. The court responded and quoted *State v. Charles*, 304 Kan. 158, 175, 372 P.3d 1109 (2016), *overruled on other grounds by State v. Huey*, 306 Kan. 1005, 399 P.3d 211 (2017), which stated: "'[O]n repeated reading in context, we are convinced that the "I thinks" littering the transcript in this case are mere verbal tics—transitions and time fillers akin to "um" or "uh." As such, we hold that they were not outside the wide latitude given the prosecutor.'" *Alfaro-Valleda*, 314 Kan. at 543-44. In *Alfaro-Valleda*, the court concluded the prosecutor's statements were not a verbal tic because each time the prosecutor used "we know," it "was key to the meaning of the sentence." 314 Kan. at 544.

Here, the prosecutor's use of "we know" is more like *Charles* than it is *Alfaro-Valleda*. The prosecutor stated "we know" almost 50 times in its closing argument and rebuttal. When stating, "we know," the prosecutor would say it several times in the same paragraph. She would talk for a bit without stating the words, and she would eventually begin using the phrase again multiple times in each paragraph for several pages of the transcript. The context shows the prosecutor was using the phrase as a tic. As was the case in *Charles*, the prosecutor's use of the phrase "we know" litters the transcript of her closing arguments, providing another reason why the instance Vandevelde relies on was not an error.

2. *The prosecutor's misstatement that Vandevelde "had two years" to review evidence before trial is not reversible error.*

Vandevelde also argues the prosecution misstated evidence in closing arguments when it stated: "He's had two years to review all of the State's evidence, to look at all the police reports, to look at all the witnesses' testimony and then come here today to testify in the most convenient manner." He contends this statement is incorrect because he testified that he received portions of discovery only a week before trial.

On cross-examination, the prosecutor engaged in the following exchange with Vandevelde:

"Q. Okay. So you've had two years to think about this case; correct?

"A. Yes.

"Q. All right. And you get, as part of your discovery, the entire State's file; correct?

"A. I got what I got. I mean, I don't know if it's the entirety.

"Q. Well, you get police reports; correct?

"A. Yeah. But some of them I just got at the very, very—just a week ago.

"Q. Well, your lawyer may have gave [*sic*] you copies—

"A. Okay.

. . . .

"Q. Okay. And you've had two years to go over and think about this case; right?

"A. Well, I mean, ma'am—

"Q. I'm just asking. Can you answer my question?

"A. No. The answer's no.

. . . .

"Q. Well, isn't it true that we had a preliminary hearing in this matter; correct?

"A. Yes.

"Q. And the State put on witnesses during that prior hearing?

"A. Now, that's—that's what I—that's when I saw the reports at my preliminary hearing.

"Q. Okay. And the preliminary hearing was on March 5th of 2021; correct?

35

"A. 2021; right.

"Q. Okay. So at the very least, you knew the State's evidence in March of 2021?

"A. Okay. That's fair. Yes.

"Q. Okay. So then that's well over a year from today?

"A. Okay. A year."

Although Vandevelde now states he only received police reports a week before trial, the colloquy shows he later corrected this statement and noted he received the reports at his preliminary hearing in March 2021. In any event, the colloquy shows he received portions of discovery about a year before the first day of his jury trial, which occurred in May 2022. This means the prosecutor misstated the evidence when she stated: "He's had two years to review all of the State's evidence, to look at *all the police reports*." (Emphasis added.)

The State asserts it did not err because "there were facts in evidence that suggested that the defendant had reviewed the evidence prior to the trial." To substantiate this statement, the State points to a variety of evidence it believes suggests the prosecutor's statement was correct. It highlights Vandevelde's testimony about watching a video with his counsel, becoming aware the casino card was connected to the Davidson residence at his preliminary hearing, admitting he had two years to think about his case and admitting he had received discovery, and law enforcement testimony that when it arrested Vandevelde it told him the casino card was from a car on Davidson's property.

All these statements are true. But none of them support the prosecutor's statement in closing argument that Vandevelde had "all the police reports" for "two years." The State attempts to rely on these statements to assert prosecutors can rely on reasonable inferences from the evidence. See *Tahah*, 302 Kan. at 787. And while the statements do show Vandevelde had time to review discovery before trial, they do not directly support the prosecutor's remarks. Since the prosecutor misstated evidence in closing arguments, it erred.

36

Vandevelde also contends the prosecutor erred in making this statement because it insinuated "Vandevelde was testifying falsely." He relies on *State v. Pabst*, 268 Kan. 501, 505-07, 996 P.2d 321 (2000), and *State v. Lockhart*, 24 Kan. App. 2d 488, 492-93, 947 P.2d 461 (1997). But he immediately concedes the prosecutor's comment does not rise to the level of *Pabst*. In *Pabst*, the prosecutor during closing arguments told the jury the defendant "'lied to you.'" 268 Kan. at 505-06.

The prosecution did not tell the jury that Vandevelde was a liar, nor did it directly insinuate Vandevelde was untruthful. Both Vandevelde and the State have an incentive to build their case theory around evidence and testimony which is most "convenient" to that theory. Of course, both parties will attempt to highlight evidence which helps their respective theories. That is the nature of an adversarial court system. Indeed, "'[t]he very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free.'" *United States v. Cronic*, 466 U.S. 648, 655, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984). It is not incorrect to say Vandevelde had time to review evidence and that he would want to testify in a "partisan," advantageous way to his case.

Although the prosecutor may not have erred by "insinuating" Vandevelde was testifying in a way most convenient for him, she did err when she incorrectly stated Vandevelde had two years to review police reports. So we must now determine whether the error is harmless. See *Sherman*, 305 Kan. at 109. The State bears the burden of showing harmlessness.

The State asserts the error was harmless because the statements "were not inflammatory" and "[t]he timing between over a year and two years is trivial as it relates to the argument being made." We find this argument persuasive. The outcome of the trial was not affected because the prosecution told the jury Vandevelde had two years to review police reports when he had over a year. The evidence the prosecutor misstated did

37

not relate to the crimes charged or their respective elements. Rather, the colloquy the prosecutor referenced in closing concerned the timeline and procedures of Vandevelde's trial. No reasonable juror would find Vandevelde guilty simply because the prosecutor misstated the time Vandevelde had to review evidence. Even if the prosecutor had correctly stated Vandevelde had over a year to review police reports, no reasonable juror could find Vandevelde guilty because that fact cannot prove he is guilty of the crimes charged. The error is therefore harmless.

We therefore find the prosecutor did not misstate the evidence when she noted, "We know that things were out of place and we know things were moved around" because there is evidence to support these statements and because the prosecutor used this phrase to describe direct evidence instead of conclusions requiring inferences. And while we find the prosecutor erred when she incorrectly stated Vandevelde had two years to review police reports, we find that error was harmless. The colloquy between the prosecutor and Vandevelde during trial showed this statement is untrue and the incorrect statement is so trivial that it is unreasonable to conclude it affected the outcome of the trial.

## V. *Did cumulative errors deprive Vandevelde of a fair trial?*

Vandevelde's final argument is that he was deprived of a fair trial because his trial contained an instructional error and prosecutorial error. See *State v. Macomber*, 309 Kan. 907, 921-22, 441 P.3d 479 (2019) (instructional errors may implicate due process right to fair trial); *Sherman*, 305 Kan. at 109 (prosecutorial error implicates due process right to fair trial).

The test for cumulative error is whether the totality of the circumstances establishes the defendant was substantially prejudiced by cumulative errors and was denied a fair trial. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014). One error

cannot support reversal under the cumulative error rule. *State v. Cofield*, 288 Kan. 367, 378, 203 P.3d 1261 (2009). The prosecution erred when it stated Vandevelde had two years to review the police reports when, in fact, he only had about a year. But that is the only error we have recognized. Since there are no errors to accumulate, the cumulative error doctrine is inapplicable.

Affirmed.